875 F.2d 1558
 58 USLW 2053
 Joy D. WEHUNT, Plaintiff,
v.
James G. LEDBETTER, in his official capacity as Commissioner
of the Georgia Department of Human Resources and
Louis Sullivan, Defendants-Appellees.
Gwendolyn Brown, Intervenor-Appellant.
 No. 87-8345.
 United States Court of Appeals,
Eleventh Circuit.
 June 27, 1989.
 
 Kay A. Giese, Athens, Ga., John Riemer, Gainesville, Ga., Phyllis J. Holmen, Atlanta, Ga., Nancy R. Lindbloom, Georgia Legal Services, Athens, Ga., for Gwendolyn Brown.
 Paula Roberts, Center for Law & Social Policy, Washington, D.C., for amicus Center for Law & Social Policy.
 Mary Foil Russell, State of Ga. Law Dept., Atlanta, Ga., for defendants-appellees.
 Robert E. Keith, Office of Gen. Counsel, HHS, Washington, D.C., for Bowen.
 Susan Hoffman, Hogan & Hartson, Washington, D.C., for amicus Center for Law & Social Policy.
 Nancy Ebb, Children's Defense Fund, Washington, D.C., for amicus Children's Defense Fund.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before FAY and CLARK, Circuit Judges, and GUIN*, District Judge.
 PER CURIAM:
 
 
 1
 Presently before the court is a challenge to the program established under the Aid to Families with Dependent Children (AFDC), 42 U.S.C. Secs. 651 et seq. (1982 & Supp. III 1985), by recipients of its benefits. The challenge seeks to require the State of Georgia and the Department of Health & Human Services to administer and enforce the provisions of Title IV-D of the Social Security Act, 42 U.S.C. Secs. 651 et seq. (hereinafter The Act). In separate orders, the district court dismissed the plaintiffs' various claims. For the reasons which follow, we affirm the district court.
 
 Background
 A. The Statutory Framework
 
 2
 The AFDC program, also known as Title IV-A of The Act, is a federal-state welfare program for poor families deprived of support of one parent due to that parent's absence, death, or incapacity. 42 U.S.C. Sec. 601 et seq. States administer program benefits in accordance with federal requirements, and the Department of Health & Human Services (HHS), which is responsible for program oversight,[1] withholds or reduces federal matching funds if a state fails to comply with those requirements.[2]
 
 
 3
 In 1975 Congress amended The Act to require a state operating an AFDC program to establish a separate child support enforcement unit to serve both AFDC and non-AFDC families.[3] Pub.L. 93-647, Sec. 101(d)(5)(c) et seq., 88 Stat. 2351 (1975) (codified at 42 U.S.C. Sec. 602(27)). The law made provision to locate absent parents, establish paternity and support obligations on behalf of children in need of those services, and enforce child support obligations assigned to the enforcement unit.[4] In 1984 Congress passed the Child Support Enforcement Amendments, Pub.L. 98-378, 98 Stat. 1305, by which states were to implement the child support enforcement mechanisms specifically enumerated in the statute to "increase the effectiveness" of the programs administered by the states. The states are required to create a system of wage withholding which can automatically recover child support and arrearages. 42 U.S.C. Sec. 666(a)(1), (8) and Sec. 666(b). Procedures by which the state child support enforcement agency and the state shall provide for enforcing a support order follow: require the parent to post security or a bond;[5] impose liens on real or personal property;[6] withhold the amount of an arrearage from tax returns;[7] and, report significant arrearages to credit reporting agencies.[8]
 
 
 4
 The AFDC program is a contractual arrangement by which the federal government and the states work together. The program is funded by both, with the federal government making payments to the states by set formula.[9] The Secretary is empowered to evaluate the implementation of state programs and conduct audits of the plans to assure conformity with the requirements.[10] If the evaluation and audit show nonconformity, the Secretary must reduce or suspend payment to the noncomplying state until such time as the state program is found to be in substantial compliance.[11] As a condition for receiving AFDC benefits, an applicant must assign to the state any support rights the family has and must cooperate with the state agency's efforts to establish paternity and collect support unless such cooperation is against the best interests of the child.[12] Except for the first fifty dollars of child support collected each month, which is paid to the family and does not affect the family's AFDC eligibility or decrease any amount otherwise payable as assistance to such family, the state retains support collections to help offset welfare expenditures on the family's behalf.[13] If a support collection exceeds the family's AFDC grant, "the State will determine if such collection, when treated as if it were income, makes the family ineligible for an assistance payment." In such event the family receives the full amount of the support payment.[14]
 
 
 5
 Congress again amended The Social Security Act in 1988 to replace the AFDC program with a comprehensive program of mandatory child support and work training. Pub.L. 100-485, 102 Stat. 2345 (1988). The revisions are designed to emphasize parental responsibility and strengthen the child support enforcement system. States are required to establish guidelines which must be used in setting child support awards.[15] Additionally, they are required to provide mechanisms to facilitate the periodic updating of child support awards, and to institute a system of immediate wage withholding for all new or revised child support cases. The bill provides for the establishment of a commission on interstate enforcement, the establishment of an automated tracking and monitoring system, and the use of parents' social security numbers for identification purposes at birth, among other things. Under II. General Discussion of the Bill, the Senate Report states:
 
 
 6
 We need now to fashion a firm and effective welfare structure, one that addresses the needs of all areas of the country.
 
 
 7
 The bill reported by the Committee on Finance seeks to do this. It builds upon a strong consensus, joined in by liberals and conservatives alike, that the Nation's welfare system must stress family responsibility and community obligation, enforce the principle that child support must in the first instance come from parents, and reflect the need for benefit improvement, program innovation, and organizational renewal at every level in the system.
 
 
 8
 Id.
 
 
 9
 One of the major elements in the revision of The Act is to strengthen the child support system by improving all stages of the enforcement process. It requires the Secretary "to set standards specifying time limits in which a state must respond to requests for service, including requests to locate absent parents, establish paternity, or initiate proceedings to establish and collect support." This addition eliminates the possibility of a time delay inherent in the system as it was at the time the instant suit was filed.
 
 B. Procedural History
 
 10
 Gwendolyn Brown is the mother of three minor children. The oldest child, Kateia Nicole Pinkston, was born out of wedlock January 22, 1977. Except for short periods of time when she was able to obtain employment, Ms. Brown received AFDC benefits under the Georgia Title IV-A program for Kateia from 1978 through 1987. As a condition to receive AFDC, pursuant to the enacting legislation, Ms. Brown was required to cooperate with the state in establishing Kateia's paternity and securing a support order for her.[16] She was further required to assign to the state her right to support monies paid on Kateia's behalf.[17]
 
 
 11
 Although the Georgia Department of Human Resources (the IV-D agency) has the responsibility of locating Kateia's father, establishing paternity for her, and obtaining a support order on her behalf, the Georgia IV-D agency has yet to do so.
 
 
 12
 In 1977, Ms. Brown was married. The two children of the marriage are Crystal Sabrina Brown, born January 4, 1979, and Jeriquces Blane Brown, born November 1, 1980. When their father deserted the family, Ms. Brown applied for and received AFDC for these two children as well as Kateia.[18]
 
 
 13
 Ms. Brown was divorced from Mr. Brown in November 1982. The divorce decree ordered Mr. Brown to pay twenty dollars per week as support for each of his children. The Georgia IV-D agency has failed to collect the payments.
 
 
 14
 Joy Wehunt Lewallen, the original plaintiff in this action, brought suit to obtain IV-D agency assistance in establishing the paternity of and support for her youngest child Tiffany, born in December 1983. Although she had received intermittent AFDC payments it was not until suit was filed in May 1985 that the Georgia IV-D agency took steps to determine paternity and secure child support for Tiffany.[19]
 
 
 15
 Brenda White, one of the intervenors, mother of three minor children, receives no paternal support for two of her children. Ms. White has received intermittent AFDC payments from about 1969 onward. During this period of time, although she has cooperated with the agency, as have Ms. Brown and Ms. Lewallen, the agency has taken no action to secure support for her children.
 
 
 16
 This action was brought by Lewallen on May 9, 1985, in the Federal District Court for the Northern District of Georgia. Lewallen asserted a claim under 42 U.S.C. Sec. 1983 against the Commissioner of the Georgia Department of Human Resources hereinafter the Commissioner seeking declaratory and injunctive relief with respect to defendant's violation of her rights under two Social Security Act programs, the AFDC, 42 U.S.C. Secs. 601, et seq. (Title IV-A), and the Child Support and Establishment of Paternity Act, 42 U.S.C. Secs. 651, et seq. (Title IV-D). The Title IV-A claims against the Commissioner were settled after he adopted a revised policy as to the definition of "child support." This definition was incorporated into a consent order agreed to by all parties and adopted as the order of the district court on January 20, 1987. Thus, the Title IV-A claim is not at issue in the instant appeal. Lewallen's remaining claim against the Commissioner centered around his failure to provide her with the services necessary to locate the father of her child, establish paternity of that child, and establish and enforce a support obligation for that child, in violation of the Child Support and Establishment of Paternity Act. Plaintiff Lewallen also sued the Secretary, asserting that he had failed in his duty to oversee Georgia's operation of its state plans under Titles IV-A and IV-D and in his obligation to enforce compliance by the Commissioner with the conditions of participation in the AFDC program.
 
 
 17
 On October 23, 1985, the district court granted the motion of Brenda White and Gwendolyn Brown to intervene as plaintiffs and to file an amended complaint. Plaintiffs then moved for class certification and for leave to file a second amended complaint to clarify certain class allegations. In their second amended complaint, plaintiffs made clear that the class injury for which they sought redress was the Commissioner's systematic failure to (1) implement and operate a statewide child support enforcement program which diligently sought to establish paternity, locate absent parents, establish child support obligations and collect child support, as required by Title IV-D and its implementing regulations; and (2) assure that the Georgia IV-D program operated in compliance with the statute and regulations. Leave to file a second amended complaint was granted, and the plaintiffs initiated discovery as to both defendants.
 
 
 18
 At plaintiffs' request, a status conference was held April 23, 1986. At that time the court directed that any motions under Fed.R.Civ.P. 12 be filed within thirty days. The court also stayed discovery, deferred plaintiffs' motions to compel discovery and class certification, granted plaintiffs the opportunity to redefine their class, and stated its intention to extend discovery if plaintiffs' case survived any Rule 12 motions. The Commissioner and the Secretary filed motions to dismiss under Rule 12, claiming the plaintiffs had failed to state claims upon which relief could be granted. The plaintiffs responded to the defendants' motion to dismiss, and also moved for leave to file a third amended complaint.
 
 
 19
 On October 1, 1986, the court entered an order holding that, under Brown v. Housing Authority of McRae, 784 F.2d 1533 (11th Cir.1986), vacated pending reh'g en banc, 804 F.2d 612 (11th Cir.1986), on reh'g, 820 F.2d 350 (11th Cir.1987), the plaintiffs' claim against the Commissioner under 42 U.S.C. Sec. 1983 and their claim against the Secretary under 42 U.S.C. Secs. 651 et seq., had to be dismissed under Rule 12(b)(6). The district court reasoned that Congress had foreclosed private enforcement of Title IV-D and there was no implied right of action under the statute. In its order, the district court granted the plaintiffs' motion for leave to file a third amended complaint, and denied as moot the plaintiffs' motion for class certification.
 
 
 20
 On October 17, 1986, plaintiffs filed their third amended complaint, asserting claims against the Secretary under the Administrative Procedure Act, 5 U.S.C. Secs. 701 et seq. [hereinafter APA], and for mandamus relief pursuant to 28 U.S.C. Sec. 1361. In addition, in order to appeal, plaintiffs sought entry of a judgment based on the October 1, 1986, order under Fed.R.Civ.P. 54(b). In light of the fact that the Eleventh Circuit Court of Appeals had vacated its decision in Brown v. Housing Authority of McRae, pending rehearing en banc, the plaintiffs also moved in the district court for an order setting aside the October 1, 1986, order. In an addendum to that motion plaintiffs brought to the district court's attention the Supreme Court's decision in Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), which implicitly overturned parts of the Brown decision.[20]
 
 
 21
 The Secretary answered the plaintiffs' third amended complaint and on December 3, 1986, filed a motion under Fed.R.Civ.P. 12, alleging that the plaintiffs had failed to state a claim upon which relief could be granted. On January 14, 1987, plaintiffs moved for class certification on the APA and mandamus claims. The district court entered an order March 11, 1987, granting the Secretary's motion to dismiss and denying the plaintiffs' motion for class certification. The district court held that the plaintiffs lacked standing under the APA. The court also denied the plaintiffs' motion to set aside the October 1, 1986, order, concluding that its previous decision was not changed by Wright and Brown. Ms. Brown filed a notice of appeal as to both the state and federal defendants on May 8, 1987, and the appeal was docketed on May 29, 1987. Neither Lewallen nor White has appealed.
 
 I.
 
 22
 The first issue on appeal is whether the complaint states a cause of action against the state defendant under 42 U.S.C. Sec. 1983. In Maine v. Thiboutot, 448 U.S. 1, 8, 100 S.Ct. 2502, 2506, 65 L.Ed.2d 555 (1980), the Supreme Court held that violation of a federal statute is cognizable under 42 U.S.C. Sec. 1983. Since Thiboutot, however, the Court has delineated two exceptions to this general rule. Section 1983 does not encompass claims based on statutory violations if (1) Congress has foreclosed private enforcement in the enactment of the statute, Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 20-21, 101 S.Ct. 2615, 2626-27, 69 L.Ed.2d 435 (1981), or (2) Congress has not created enforceable rights in the relevant statutory provisions. Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 24-25, 101 S.Ct. 1531, 1544-44, 67 L.Ed.2d 694 (1981).
 
 
 23
 The analysis here requires a determination of whether plaintiff has a "right" under a federal statute and if so whether the federal statute precludes beneficiaries from seeking enforcement of those rights in a private cause of action. The Commissioner urges that Title IV-D of the Act does not afford plaintiff an enforceable right as defined by the Supreme Court in Pennhurst. We agree and therefore find it necessary only to discuss that issue.
 
 
 24
 The State contends that Title IV-D was enacted to recoup welfare expenditures, to ease the burden on the state and federal fiscs, to check the rising tide of families forced to resort to public assistance, and to reward states which maintain "cost-effective and efficient child support recovery operations." By achieving net savings for federal, state, and local governments' welfare appropriations Title IV-D will benefit the general public.
 
 
 25
 Although state participation in the Social Security Act itself is mandatory, participation by a state in the IV-D program is voluntary. It is enacted pursuant to the spending power of Congress. Case law interpretation of Congress' power to legislate pursuant to the spending power has recognized that when Congress fixes the terms on which it shall disburse federal money to the state, it is much in the nature of a contract: in return for federal funds, the states agree to comply with federally imposed conditions. Pennhurst, 451 U.S. at 17, 101 S.Ct. at 1540, 67 L.Ed.2d at 707.[21] Pennhurst held that a funding statute that did not clearly condition the receipt of federal money on the implementation of certain procedures did not create any enforceable rights.
 
 
 26
 The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." ... There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.
 
 
 27
 451 U.S. at 17, 101 S.Ct. at 1540, 67 L.Ed.2d at 707 (citations and footnote omitted).
 
 
 28
 In Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26, 36 (1975), the Supreme Court enunciated four factors to determine whether a statute creates a private cause of action.
 
 
 29
 In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted," ...--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? (citations omitted).
 
 
 30
 The District of Columbia Circuit in Edwards v. District of Columbia, 821 F.2d 651 (D.C.Cir.1987), affirmed the lower court's holding that public housing tenants did not have rights against constructive demolition of a housing project. In reaching its decision the court addressed the issue of when federal statutes create rights enforceable under Sec. 1983 and discussed the Ash factors in reaching its conclusion.
 
 
 31
 This question comprises the first of four factors used to determine whether to imply a cause of action from a federal statute.... Although now the second factor of the Cort test, which emphasizes a more direct and rigorous search for congressional intent, is given the greatest weight, see Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 106 S.Ct. 3229, 3234 n. 9, 92 L.Ed.2d 650 (1986) (listing post-Cort Supreme Court cases stressing strict fidelity to congressional intent in implied cause of action field), the first factor of the Cort test does look to whether "the plaintiff [is] 'of the class for whose especial benefit the statute was enacted' ...--that is, does the statute create a federal right in favor of the plaintiff?" ... Supreme Court cases that employed the Cort test initially emphasized this first factor, and concentrated particularly on whether or not the statute in question speaks in terms of specific right and duties. See, e.g., Cannon v. University of Chicago, 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 1954-55 n. 13, 60 L.Ed.2d 560 (1979)....
 
 
 32
 We believe the analogy to be sound despite the Court's subsequent movement in implied cause of action jurisprudence away from Cort's first factor and toward its second factor. This movement toward an exclusive focus on whether Congress intended to create a private cause of action indicates the Court's growing realization that it ought not conflate the question of whether a statute creates rights with the question of whether it creates a private cause of action to enforce those rights. However, in a case like ours, where a separate congressionally created cause of action, Sec. 1983, clearly exists, then the focus on whether the statute creates rights is appropriate, and the value of the first Cort factor is retained.
 
 
 33
 821 F.2d at 655 n. 4 (citations omitted).
 
 
 34
 Title IV-D does not create any enforceable right: it was not enacted for the "especial benefit" of AFDC families. A Title IV-D program operates under a separate legislative and regulatory framework than that of a Title IV-A program. Title IV-A provides funds from the public treasure to support children in need. Title IV-D seeks to recover those funds and restore the Treasury balance by enforcement of support obligations owed by the absent parents of these children. The driving force behind the program is recovery of welfare payments and a parallel commitment to remove and keep families from the necessity of welfare dependence by establishing and enforcing support obligations. The legislative history indicates that in enacting Title IV-D Congress was primarily concerned with collecting child support in order to reduce the welfare rolls.
 
 
 35
 The problem of welfare in the United States is, to a considerable extent, a problem of the non-support of children by their absent parents. Of the 11 million recipients who are now receiving Aid to Families With Dependent Children (AFDC), 4 out of every 5 are on the rolls because they have been deprived of the support of a parent who has absented himself from the home.
 
 
 36
 The Committee believes that all children have the right to receive support from their fathers. The Committee bill, like the identical provision passed by the Senate (H.R. 3153) last year, is designed to help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup.
 
 
 37
 S.Rep. No. 93-1356, 93rd Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Admin.News 8133, 8145-46 (beginning paragraphs of "Section IV. Child Support").
 
 
 38
 The above-quoted language indicates the concern Congress felt over the welfare problem. Its reading indicates the goal of Title IV-D was to immediately lower the cost to the taxpayer as well as to lessen the number of families enrolling in welfare in the future--benefits to society as a whole rather than specific individuals. This reading is consistent with the concern evidenced by Congress in "Section II. Social Services" entitled "Rapid rise in Federal funds for social services," and "Federal funds for social services limited in 1972." which precedes the section on child support.
 
 
 39
 Even before then, the legislative history preceding passage of Title IV-D indicates the concern Congress felt for increasing collection of support payments and thereby reducing the amount expended for welfare. The Report of the Committee on Finance of the United States Senate to accompany H.R. 3153 contains a section under "VII. Child Support (Sec. 151 of the bill)" entitled "Incentives for Localities To Collect Support Payments." The language indicates reimbursement of welfare costs is the incentive for states and localities to collect support payments.
 
 
 40
 Under present law, when a State or locality collects support payments owed by a father, the Federal Government is reimbursed for its share of the cost of welfare payments to the family of the father; ...
 
 
 41
 In most States, however, local units of government, which would often be in the best position to enforce child support obligations, do not make any contribution to the cost of AFDC payments and consequently do not have any share in the savings in welfare costs which occur when child support collections are made. Since such a fiscal sharing in the results of support collections could be a strong incentive for encouraging the local units of government to improve their support enforcement activities, the bill would provide that if the actual collection and determination of paternity is carried out by local authority, the local authority would receive a special bonus based on the amount of any child support payments collected which result in a recapture of amounts paid to the family as AFDC.
 
 
 42
 S.Rep. No. 93-553, 93rd Cong., 1st Sess., Social Security Amendments of 1973, reprinted in Senate Miscellaneous Reports on Public Bills VII (emphasis added).
 
 
 43
 Title IV-D is also not a legal assistance program. AFDC recipients do not apply for nor request support enforcement services. They assign their child support rights to the state[22] and are required to cooperate (unless good cause for refusing to do so is determined to exist) in whatever legal action the state undertakes.[23] By assigning their child support rights in return for AFDC aid, they give the states the opportunity to recoup the financial drain imposed by the welfare system on the state and federal treasuries. As was its intent, as evidenced by the language of the statute and the legislative history, diminishing the welfare outlay benefits society as a whole. Consistent with that intent we cannot hold that Title IV-D creates enforceable rights under Pennhurst.
 
 II.
 
 44
 The plaintiffs also sued the Secretary of the Department of Health and Human Services alleging a failure to enforce Title IV-D. That claim was brought either under the Administrative Procedure Act, 5 U.S.C. Sec. 701 et seq.,[24] or under Title IV-D itself. The district court found that the plaintiffs lacked standing to sue the Secretary and that no private cause of action could be implied under Title IV-D. Since we find that the appellant has no article III standing to sue the Secretary, we necessarily find that she cannot sue under the APA or Title IV-D.
 
 
 45
 In order to have standing to sue under the APA, the plaintiffs must be injured in fact, and "the interest sought to be protected ... [be] arguably within the 'zone of interests' to be protected or regulated by the statute." Clarke v. Securities Industry Assn., 479 U.S. 388, 394, 107 S.Ct. 750, 755, 93 L.Ed.2d 757, 766 (1987).[25] We need not, however, consider whether the appellant is within the zone of interests protected by Title IV-D because we find that she lacks article III standing.
 
 
 46
 Federal courts may only decide actual cases and controversies. The doctrine of article III standing determines whether the plaintiff is entitled to have the court decide the merits of a dispute. Allen v. Wright, 468 U.S. 737, 750-51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984). There is a core constitutional requirement that a plaintiff allege some actual or threatened injury that is fairly traceable to the defendant and can be remedied by an order directed against the defendant. Id. In this case, the plaintiff alleges two distinct injuries: the loss of fifty dollars in support and the failure to establish her child's paternity. These injuries are sufficiently distinct to be judicially cognizable. 468 U.S. at 755-58, 104 S.Ct. at 3327-3330, 82 L.Ed.2d at 571-74 (claim of injury from government's noncompliance with law too general to be judicially cognizable but injury of diminished ability to receive integrated education is cognizable).
 
 
 47
 There must also be a nexus between the injury and the action of the defendant. The injury must both be caused by the defendant and be remediable by the defendant. In Allen v. Wright, the Supreme Court found that parents had no standing to challenge the Internal Revenue Service's administration of guidelines concerning the tax status of racially discriminatory private schools. The Court held that the injury alleged by the plaintiffs (the reduced ability to receive an integrated education) was caused directly by the school's policy of discrimination and was only indirectly encouraged by the IRS policy. The Court held that the causal connection between the IRS's application of their guidelines was too attenuated to allow the plaintiffs to sue the IRS because granting relief against the IRS would not guarantee that the schools would forego their racially discriminatory practices. 468 U.S. at 759, 104 S.Ct. at 3328-29, 82 L.Ed.2d at 574; see also Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 42-44, 96 S.Ct. 1917, 1926-27, 48 L.Ed.2d 450 (1976) (claimed injury of reduction in hospital services not sufficiently traceable to IRS revenue ruling to confer standing).
 
 
 48
 In this case the appellant alleges the inaction by the Secretary has allowed the State of Georgia to ignore the Title IV-D requirements and has resulted in the injury to the plaintiffs. She relies on little more than the remote possibility, unsubstantiated by allegations of fact, that her situation might have been better had the defendant acted otherwise, and that her situation might improve were the court to afford relief. Appellant's injury is directly related to the absence of the fathers who have deserted their families to welfare--not because she assigned her rights to support payments in return for AFDC aid. The court might add that had she been receiving support payments from the father it would not have been necessary for her to assign her support rights to the State of Georgia. The assignment directly benefited her financially.
 
 
 49
 The nexus that the appellant alleges between the injury and the Secretary is attenuated at best since the injury is directly caused by a third party who is not a party to the lawsuit, namely the absent father. The attenuation and lack of redressability are clear since the appellant concedes that even rigorous enforcement of the child support laws does not guarantee that any father will be located and if so that any child support will be collected. The chain is even more attenuated, however, since the plaintiffs seek to sue the Secretary because nothing the Secretary can do will actually remedy the injury suffered by these plaintiffs. The only weapon of the Secretary is to withhold a portion of the federal funds if Georgia does not comply with the statute. It is far from certain that the withholding of the funds will result in more vigorous enforcement of the Georgia child support laws. It is clear that the plaintiffs "rely on little more than the remote possibility ... that their situation might have been better had the [Secretary] acted otherwise, and might improve were the Court to afford relief." Warth v. Seldin, 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975).
 
 
 50
 We find that the appellant has failed to prove the challenged practices harm her and that she would benefit in a tangible way from the court's intervention. We find that Title IV-D was not enacted to confer a private cause of action on the appellant or any other person similarly situated. Where a federal statute provides its own comprehensive enforcement scheme, as here, the requirements of that enforcement procedure may not be bypassed by bringing suit directly. A ruling to the contrary would open the door for multitudinous suits to be decided by federal court adjudication. It is not the function of the judiciary to direct the Secretary in the fulfillment of his role as overseer of the IV-D program. Such could not have been the intent of Congress.
 
 
 51
 "Carried to its logical end, [appellants'] approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse'; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action."
 
 
 52
 * * *
 
 
 53
 "[a] federal court ... is not the proper forum to press" general complaints about the way in which government goes about its business.
 
 
 54
 Allen v. Wright, 468 U.S. at 759, 104 S.Ct. at 3329, 82 L.Ed.2d at 575-76.
 
 
 55
 AFFIRMED.
 
 CLARK, Circuit Judge, dissenting:
 
 56
 I respectfully dissent from the majority's discussion of the plaintiff's right to sue the state defendants. I object both to the analysis employed in determining whether section 1983 provides a cause of action for the violation of Title IV-D and also to the majority's interpretation of Title IV-D. The state defendants have not established that Title IV-D precludes reliance on section 1983 by private plaintiffs to ensure that the state is in compliance with the statute.
 
 
 57
 Section 1983 expressly gives individuals the right to sue a state for its noncompliance with a federal statute. Maine v. Thiboutot, 448 U.S. 1, 8, 100 S.Ct. 2502, 2506, 65 L.Ed.2d 555 (1980). Although the Supreme Court has found two exceptions to this general rule, it recently held that the burden of proving that private enforcement is precluded rests with the state.
 
 
 58
 Under these cases, if there is a state deprivation of a "right" secured by a federal statute, Sec. 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement.
 
 
 59
 Wright v. City of Roanoke Redevelopment Authority, 479 U.S. 418, 423, 107 S.Ct. 766, 771, 93 L.Ed.2d 781 (1987) (emphasis added). The burden is placed on the state actor because courts should not "lightly conclude that Congress intended to preclude reliance section 1983 as a remedy." Id. (quoting Smith v. Robinson, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746 (1984)).
 
 
 60
 Instead of placing the burden of proof on the defendant in this case, the majority relies at least partially on case law concerning whether a private cause of action can be implied under a federal statute. In Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct.2080, 2088, 45 L.Ed.2d 26 (1975), the Supreme Court announced a strict four part test to determine whether Congress intended a private cause of action. Under the Cort test, however, the plaintiff must affirmatively prove that Congress intended to allow a private cause of action.
 
 
 61
 The majority's confusion of the two different lines of case law is extremely significant in this case. The factors considered under each test are similar. But, the fact that the burden of proof is on a the state in a section 1983 suit and on a plaintiff in an implied cause of action suit is of fundamental importance. Therefore to the extent that the majority's reliance on the implied right of action cases reflects a misunderstanding of the burden of proof on this issue, the foundation of the majority's analysis evaporates.
 
 
 62
 Furthermore, I dissent because the majority has misinterpreted Title IV-D and misread its legislative history. While no one can deny that the statute helps recover some of the money spent on AFDC, there is nothing in the statute or its legislative history which supports a finding that fiscal conservation was the goal of the statute. Rather, Congress made clear that it was concerned about the rising number of children who were abandoned by their fathers. The statute's clear intent to benefit the children and their families creates enforceable rights under section 1983.
 
 I. Statutory Framework
 
 63
 A. Aid to Families with Dependent Children (AFDC)
 
 
 64
 AFDC (Title IV-A of the Social Security Act), is a federal-state cooperative effort administered by the states. The AFDC program, created by the Social Security Act of 1935, provides monetary payments from the state to financially needy families which include children deprived of parental support due to death, disability, or desertion. 42 U.S.C. Sec. 601. States are not required to participate in the AFDC program, but if they choose to do so, they must operate a program which meets the statutory requirements in 42 U.S.C. Sec. 602, as well as the provisions of detailed federal regulations promulgated by the Secretary. See 45 C.F.R. Secs. 201, et seq. An explicit condition for the receipt of any federal AFDC money is that participating states have in effect a plan for child support collection which meets the standards set forth in Title IV-D of the Social Security Act, 42 U.S.C. Secs. 651, et seq. The state must operate a child support recovery program in substantial compliance with that plan. 42 U.S.C. Sec. 602(a)(27).
 
 B. Title IV-D
 
 65
 The federal government has made efforts since 1950 to require that absent parents support their children. The Social Security Act Amendment of 1950, Ch. 809, Sec. 321(b), 64 Stat. 549 (codified as amended at 42 U.S.C. Sec. 602(a)(1)), required welfare workers to inform law enforcement officials of cases in which AFDC was needed due to abandonment by a parent. In 1967, Congress began requiring that states set up formal child support recovery programs, with the federal government providing half the funding. Social Security Act Amendment of 1967, Pub.L. No. 90-248 Sec. 211, 81 Stat. 896 (codified as amended at 42 U.S.C. Sec. 602(a)(17)). However, despite the federal funding, state programs for child support recovery were near-complete failures and federal oversight was almost non-existent.
 
 
 66
 Therefore, in 1974, Congress enacted the Social Security Amendments of 1974 (the 1974 amendments), Pub.L. No. 93-647, 88 Stat. 2351, (codified as amended at 42 U.S.C. Secs. 652 et seq.). Designed "to assure an effective program of child support," the 1974 amendments were a radical revision of the previous law. S.Rep. No. 93-1356, 93rd Cong., 1st Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 8133, 8148-8149. The 1974 amendment increased the federal matching funds from 50% to 75% as an incentive for the states to develop the appropriate programs (one of which was a Title IV-D agency). Similarly, incentive payments were available to any local governmental units which improved their enforcement of support orders. Noting that "the enforcement of child support obligations is not an area of jurisprudence about which this country can be proud," id., reprinted in 1974 U.S.Code Cong. & Admin.News at 8146, the primary focus and intended beneficiary of the Act was the child and the family unit.
 
 
 67
 Before the 1974 amendments, any child support paid to the AFDC family was counted dollar-for-dollar in reducing the amount of the AFDC grant. The 1974 amendments provided that the state require individuals to assign to the state their right to receive child support payments as a condition of receiving the AFDC grant. Pub.L. No. 93-647, Sec. 101(e)(5), 88 Stat. 2351 (codified at 42 U.S.C. Sec. 602(a)(26)(A)). Thus the families were assured of receiving a set amount of money each month regardless of the personal vicissitudes of the absent parent.
 
 
 68
 After minor intervening amendments, a second sweeping set of changes in the child support enforcement requirements of the Social Security Act was instituted with the Child Support Enforcement Amendments of 1984, Pub.L. 98-378 (the 1984 amendments), 98 Stat. 1305 (codified at 42 U.S.C. Secs. 651, et seq.). In strengthening the Title IV-D requirements, Congress again focused on the needs and rights of families and children and the benefits to them of a strong, efficient, and effective child support recovery program. The 1984 amendments required the states to pass laws allowing for mandatory wage withholding and continuing garnishments, voluntary wage assignments, and the use of liens, 42 U.S.C. Secs. 654(20), 666. In addition, more federal cooperation was extended through federal tax withholding availability, 42 U.S.C. Sec. 664, and extending access to the federal Parent Locator Services, 42 U.S.C. Sec. 663.
 
 
 69
 These amendments were intended to ensure that "all children in the United States who are in need of assistance in securing financial support from their parents will receive assistance regardless of their circumstances." S.Rep. No. 98-387, 98th Cong., 2d Sess., at 1, reprinted in 1984 U.S.Code Cong. & Admin.News, 2397, 2397 (emphasis added). Congress mandated that Title IV-D child support recovery and paternity establishment services be provided to both AFDC and non-AFDC recipients. 42 U.S.C. Secs. 651, 654(6).
 
 
 70
 Within days of the passage of the 1984 amendments, Congress also passed the Deficit Reduction Act of 1984 (DEFRA), Pub.L. No. 98-369 Sec. 2640, 98 Stat. 1145. One of the provisions in DEFRA, section 2640, provided that, when a non-custodial or absent parent of children receiving AFDC makes support payments to the state, the first fifty dollars collected would be paid to the family without affecting its eligibility for assistance or decreasing the amount of assistance it received. 42 U.S.C. Secs. 657(b)(1), 602(a)(8)(A)(vi).
 
 
 71
 The law prior to 1988 required states, on penalty of the withholding of AFDC funds, to have in effect and operate a child support enforcement program which meets the requirements of Title IV-D of the Social Security Act. 42 U.S.C. Sec. 602(a)(27); see 45 C.F.R. Secs. 302.12, 303.20. The state must undertake the establishment of paternity and the establishment and enforcement of support obligations for all AFDC children unless it is against the best interests of the child to do so. 42 U.S.C. Sec. 654(4); 45 C.F.R. Secs. 303.4(b), 303.5, 303.6. The state must provide Parent Locator Services, 42 U.S.C. Sec. 654(8), and must comply with all other requirements and standards of the Secretary. 42 U.S.C. Sec. 654(13). These services must be available for nonrecipients of AFDC as well. 42 U.S.C. Secs. 651, 654(6); 45 C.F.R. 302.33(a). In addition, the state is under an obligation to publicize the availability of such services. 45 C.F.R. Sec. 302.30.
 
 
 72
 In 1988 Congress increased the obligations of the states. Pub.L. No. 100-485, 102 Stat. 2346 (1988). Of particular significance is that Congress directed the Secretary to promulgate regulations establishing the time frame within which states must respond to requests to enforce child support orders or establish paternity. Pub.L. No. 100-485, Sec. 121, 102 Stat. 2351. This was to insure action on the part of the states--the particular action being sought by plaintiffs in this case.
 
 II. The Section 1983 Claim
 
 73
 The plaintiffs brought this suit against the state defendants under 42 U.S.C. Sec. 1983 alleging that Georgia has not complied with the requirements of Title IV-D. It is clear that section 1983 encompasses claims based on purely statutory violations of federal law. Maine v. Thiboutot, 448 U.S. at 8, 100 S.Ct. at 2504-05 (1980). There are, however,
 
 
 74
 "two exceptions to the application of Sec. 1983 to statutory violations." ... First, if Congress has foreclosed private enforcement of the statute in question in the enactment of the statute itself, then Sec. 1983 is unavailable to enforce federal rights under the statute.... For example, "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under Sec. 1983." ... Second, if Congress has not created enforceable rights in the relevant statutory provision, there is no cause of action available under Sec. 1983.
 
 
 75
 Silver v. Baggiano, 804 F.2d 1211, 1216 (11th Cir.1986) (quoting Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 20-21, 101 S.Ct. 2615, 2626-27, 69 L.Ed.2d 435 (1981)).
 
 
 76
 A. Does Title IV-D Create Enforceable Rights?
 
 
 77
 In Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Supreme Court held that section 6010 of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. Sec. 6000 et seq., did not create substantive rights in favor of the disabled. Section 6010, which was called the "bill of rights" provision of the Act, provided that Congress made certain "findings": (1) that persons with developmental disabilities have a right to appropriate treatment, services, and rehabilitation; (2) that the treatment for a person with developmental disabilities should be designed to maximize the developmental potential of the individual and should be provided in the least restrictive setting; and (3) that the federal government and the states both have an obligation to assure that public funds are not provided to any institution which does not provide treatment appropriate to the needs of the person or does not meet federal standards.
 
 
 78
 The Court found that Congress did not intend to create a substantive right to appropriate treatment in the least restrictive environment. 451 U.S. at 32, 101 S.Ct. at 1547. The Court considered both the language of the statute and the legislative history and concluded that the Act was meant to "assist" the states in improving the care and treatment of the mentally disabled. Id. at 18, 101 S.Ct. at 1540. In determining Congressional intent, the Court concluded that section 6010 was merely a "general statement of 'findings' " and therefore "too thin a reed" to support the notion that it created substantive rights. Id., 101 S.Ct. at 1541. The Court also reasoned that section 6010 did not impose any conditions on states for receipt of federal funds and that federal regulations explicitly provided that federal funds could not be withheld for failure to comply with section 6010. Finally, the Court noted that the relatively small amount of federal money given to states confirmed that Congress had a limited purpose in enacting section 6010. Id. at 24, 101 S.Ct. at 1543.
 
 
 79
 In determining whether a statute creates enforceable rights, therefore, the key to the inquiry is the intent of the legislature. The question focuses on whether Congress intended to mandate state compliance with specific conditions or whether it merely intended to encourage state behavior. This intent is discerned from the plain language of the statute, for Congress must explicitly set out the conditions placed on federal aid. The use of mandatory rather than precatory language is an important factor. Pennhurst, 451 U.S. at 20, 101 S.Ct. at 1541; see Gonzalez v. Pingree, 821 F.2d 1526, 1528 (11th Cir.1987) (mandatory language in Food Stamp Act creates rights enforceable under Sec. 1983). Additionally, the clarity with which the conditions are set out may be an important consideration for the enforceability of conditions relies on the knowing and voluntary assumption of the conditions by the state. Pennhurst, 451 U.S. at 17-18, 101 S.Ct. at 1539-40; Edwards v. District of Columbia, 821 F.2d 651, 656 (D.C.Cir.1987).[1] Furthermore, a review of the legislative history of the statute and other traditional aids of statutory interpretation helps determine the legislative intent. Pennhurst, 451 U.S. at 23-28, 101 S.Ct. at 1543-45.
 
 
 80
 Unlike section 6010, the provision at issue in Pennhurst, Title IV-D is cast in mandatory terms. As a condition of receiving matching AFDC funds, states "must" have and operate a Title IV-D plan. 42 U.S.C. Sec. 602(a)(27). Moreover, Title IV-D requires that state child support plans "must provide" that the state "will undertake" to "establish the paternity" of a child born out of wedlock and "secure support for such child from his parent" unless it is against the best interests of the child to do so. 42 U.S.C. Sec. 654(4)-(5). In addition, Title IV-D requires states to notify families "at least annually" of the amount of child support collected in their behalf, 42 U.S.C. Sec. 654(5), and give to families the first fifty dollars in child support collected each month, 42 U.S.C. Secs. 602(a)(8)(A)(vi), 657(b)(1). The section also expressly conditions the receipt of federal funds on the state submitting a IV-D plan. 42 U.S.C. Sec. 602(a)(27). Additionally, a subsequent failure to substantially comply with Title IV-D results in the mandatory withholding of a percentage of matching AFDC funds unless the state submits corrective action for achieving compliance. 42 U.S.C. Sec. 603(h).
 
 
 81
 The mandatory nature of the conditions therefore set this statute apart from the one considered in Pennhurst. Title IV-D is further distinguishable from 42 U.S.C. Sec. 6010 interpreted in Pennhurst because it does not merely express a general preference for more vigorous enforcement of support orders; rather it requires states to adopt specific procedures for enforcement. In addition to requiring the state to create a system to locate delinquent parents, the states must allow for judicial determination of paternity until child reaches eighteen. 42 U.S.C. Sec. 666(a)(4). The states must also adopt laws providing for expedited procedures for obtaining and enforcing support orders. 42 U.S.C. Sec. 665(a)(2). Additionally, and perhaps most significantly, the states are required to pass laws creating specific remedial devices to ensure more effective enforcement of the child support awards. States are required to establish a system of wage withholding, reduction in tax returns of a delinquent parent, the use of liens against real and personal property, the posting of security or a bond, and procedures for reporting significant arrearages to credit reporting agencies. 42 U.S.C. Sec. 666(a)(1)-(7). 45 C.F.R. Sec. 302.70.[2] Although the use of the remedial devices other than wage withholding are somewhat discretionary to the State, the wage withholding provisions and the establishment of an expedited system of obtaining and enforcing the support obligations are mandatory. Indeed, section 666(b) explicitly sets out the criteria a wage withholding plan must contain. The specificity of these requirements belies any comparison with the generalized "findings" in section 6010 in Pennhurst.[3] To paraphrase Pennhurst, "it strains credulity to argue that participating states" did not know of their obligations under those sections.
 
 
 82
 The state attempts to contradict the language in Title IV-D by arguing that the legislative history indicates that in enacting Title IV-D Congress was primarily concerned with collecting child support in order to reduce the welfare rolls. Nothing could be further from the truth. In 1974 the Senate Finance Committee stated that "[t]he immediate result [of Title IV-D] will be a lower welfare cost to the taxpayer but, more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup." S.Rep. No. 93-1356, reprinted in 1974 U.S.Code Cong. & Admin.News at 8146 (emphasis added).
 
 
 83
 Because Title IV-D child support services are available to both AFDC and non-AFDC families, Congress' purpose was not simply to save money on welfare. Title IV-D is unambiguously phrased in terms of benefit to children and families. Title IV-D was passed
 
 
 84
 [f]or the purpose of enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for aid under part A) for whom such assistance is requested[.]
 
 
 85
 42 U.S.C. Sec. 651 (emphasis added). The legislative history echoes this purpose. In recommending the passage of Title IV-D, the Senate Finance Committee stated that "all children have the right to receive support from their fathers" and that Title IV-D was "designed to help children attain this right, including the right to have their fathers identified so that support can be obtained." S.Rep. No. 93-1356, reprinted in 1974 U.S.Code Cong. & Admin.News at 8146 (emphasis added).
 
 
 86
 Moreover, nothing cited by the majority contradicts this expression of Congressional intent. The majority finds the motivation of the Congress to be fiscal conservation based on two general discussions of the monetary benefit of the programs and two subtitles to portions of the Senate report. The majority does not evaluate the Senate report as a whole. The report did note that welfare costs had risen, but the report nowhere stated that the bill was intended to reduce welfare costs.[4] To the contrary, the 1974 amendments increased the federal share of Social Security funding from 50% to 75%. Indeed, the clear intent was to provide more services to the public, since the report made clear that the increase in funding was to go to new services and was not to replace the state funds for existing services. S.Rep. No. 93-1356, reprinted in 1974 U.S.Code Cong. & Admin.News at 8134.[5]
 
 
 87
 Additionally, nothing in the 1984 amendments reveals an intent merely to recover the cost of AFDC.[6] The amendments were passed because the states had not complied with existing law. The Senate therefore made the requirements more specific for the states and increased federal monitoring. The increased specificity of the conditions on the receipt of federal funds supports a finding that the statute creates enforceable rights.[7] The increased monitoring by the federal government is not relevant to the question of whether the statute creates rights, but rather to the second exception under Maine v. Thiboutot. Federal supervision is relevant to the question of whether, despite the creation of rights, the statute shows an intent to preclude private enforcement through section 1983. That issue is discussed infra.
 
 
 88
 The defendants also argue that the statute creates no enforceable rights because it only requires the state to operate an effective system for recovering child support obligations and establishing paternity. The defendants claim that the statute does not create a right to actually receive support or a determination of paternity. But that is not what the plaintiffs are claiming. This case is not about whether Mr. Brown pays Mrs. Brown the child support he owes, but rather whether the State of Georgia has complied with the requirements of Title IV-D and established a system of identifying absent parents and enforcing their support obligations. The State of Georgia agreed to establish such procedures when it took the federal AFDC money. The statute in mandatory language created an obligation on the part of the state to establish a certain procedure as already discussed.
 
 
 89
 The defendants may also be arguing that the plaintiffs should not be able to sue to force compliance with Title IV-D because the noncompliance does not affect them. The argument is that since the plaintiffs have assigned their right to support to the state, the failure to set up a recovery system under Title IV-D only hurts the state. This argument ignores several vital aspects of the statute. First, a family does receive the first fifty dollars in support collected. Second, non-AFDC recipients who wish to make use of a Title IV-D program certainly are affected by Georgia's failure to comply with the statute. Finally, the failure to create a system of establishing paternity clearly impacts on the AFDC and non-AFDC recipients. The state argues that the establishment of paternity only serves to help the state get reimbursed for AFDC payments. This argument ignores the benefits to the child of a paternity determination. These benefits include the possibility of establishing an interpersonal or economic relationship with the father, increased access to family medical histories and the possibility of establishing inheritance rights or eligibility for Social Security benefits.
 
 
 90
 The plain language of the statute clearly conditions state receipt of federal funds on the establishment of specific state programs. The mandatory language of the statute as well as the specificity of the conditions clearly distinguish this case from Pennhurst. I would hold that Title IV-D does create rights which are cognizable under section 1983. Therefore, I must proceed to consideration of whether the statute itself forecloses section 1983 as a remedy.
 
 
 91
 B. Has Congress Foreclosed Private Enforcement of Title IV-D?
 
 
 92
 On two occasions the Supreme Court has found that Congress intended to foreclose section 1983 actions for statutory violations. In Middlesex County Sewerage Auth. v. National Sea Clammers, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the plaintiffs filed a section 1983 action alleging violations of the Federal Water Pollution Control Act (FWPCA). The Supreme Court held that the existence of statutory remedies in the FWPCA indicated that Congress did not intend to preserve section 1983 actions for violations of the FWPCA. The remedies under the FWPCA included two citizen-suit provisions, the ability of the EPA administrator to issue compliance orders and commence suits under the FWPCA, and the ability of interested persons to seek judicial review of particular actions by the EPA administrator. Id. at 13-15, 20-21, 101 S.Ct. at 2622-23, 2626-27.
 
 
 93
 In Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the plaintiffs brought a section 1983 action alleging violations of the Education of the Handicapped Act (EHA). The Supreme Court held that the EHA's elaborate procedural mechanisms indicated that Congress had foreclosed the section 1983 action. In addition to the Secretary's ability to withhold funds from state education agencies, the statute guaranteed written notice to parents of any decisions by the local education authorities, state administrative review of decisions by the local education authorities, and judicial review of the administrative proceedings. Id. at 1011, 104 S.Ct. at 3467-68. In addition, the statute envisioned the cooperation of parents and local education authorities in formulating individualized education programs for handicapped children and required local education authorities to review and, if necessary, revise each child's education program at least once a year. The Court also noted that there was no indication in the legislative history that Congress intended to allow circumvention of the EHA's administrative procedures. Id. at 1012-13, 104 S.Ct. at 3469.
 
 
 94
 Last year, in Wright v. City of Roanoke, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the Supreme Court held that Congress had not foreclosed section 1983 actions for violations of the Housing Act. The plaintiffs in Wright, who were low-income tenants, brought a section 1983 suit claiming that a public housing authority (PHA) had overbilled them for utilities in violation of the Brooke Amendment to the Housing Act. The Court found that there was no express indication that HUD enforcement was exclusive, but there were indications that private actions were anticipated. First, although the Housing Act provided for grievance procedures within the PHAs and administrative appeals, there was no procedure by which tenants could complain to the Department of Housing and Urban Development (HUD) about the PHAs, and HUD itself had not reviewed the PHA grievance procedures. Id., 107 S.Ct. at 772. Second, the Housing Act did not establish private judicial remedies such as existed in Sea Clammers and Smith. Id. at 773. Third, although the tenants were able to sue in state court, that remedy did not prevent resort to Sec. 1983. Id. at 773-74. Fourth, HUD's authority to audit the PHAs, enforce annual contribution contracts, and cut off federal funds was a generalized power which was "insufficient to indicate a congressional intention to foreclose section 1983 remedies." The audits took place every eight years, and there were no other mechanisms to enable HUD to effectively oversee the performance of the country's 3,000 PHAs. Id. at 773.
 
 
 95
 In Gonzalez v. Pingree, 821 F.2d 1526 (11th Cir.1987), this court addressed whether Congress had foreclosed section 1983 actions for violations of the Food Stamp Act. Like the Housing Act in Wright, the Food Stamp Act did not provide for private judicial enforcement. Id. at 1529. The Gonzalez court, relying on Wright, held that a section 1983 action could be brought despite the availability of state administrative procedures, the power of the Secretary of Agriculture to enforce state compliance with the Food Stamp Act by withholding funds or seeking injunctive relief, and the possibility that recipients could invoke the enforcement powers of the administering federal agency. Id. at 1529-30. The Gonzalez court also noted that the legislative history of the Food Stamp Act evidenced a congressional purpose to leave the avenues of private judicial enforcement open. Id. at 1530.
 
 
 96
 Title IV-D is devoid of any indication that Congress intended to foreclose a section 1983 action. Unlike the federal acts at issue in Sea Clammers and Smith, but like the federal acts in Wright and Gonzalez, Title IV-D does not provide for private judicial or administrative remedies such as citizen suits or judicial review of administrative procedures. The only enforcement action contemplated by Title IV-D is the federal government's audit and withholding of funds if the state is not "complying substantially" with federal law. Although this statute does require more frequent audits than the Housing Act at issue in Wright (once every year instead of once every eight years), this difference is not determinative of the issue of private enforcement. The Secretary's withholding of funds is the only avenue available in the statute to remedy the violations. Federal oversight is not sufficient in and of itself to preclude private enforcement, for every federal statutory scheme which involves federal grants to the states necessarily involves federal supervision. See Rosado v. Wyman, 397 U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970) (AFDC case) ("We have considered and rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Congress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements."). Indeed section 1983 has long been used as a vehicle to bring claims of violations of the Social Security Act and AFDC in particular. See Maine v. Thiboutot, 448 U.S. at 4, 100 S.Ct. at 2505 (listing cases); see also Lynch v. Dukakis, 719 F.2d 504, 510-11 (1st Cir.1983) (Title IV-E); Bennett v. White, 671 F.Supp. 343, 345-48 (E.D.Pa.1987) (Title IV-D); Wilcox v. Petit, 649 F.Supp. 685, 687-88 (D.Me.1986) (Title IV-D); Carter v. Morrow, 562 F.Supp. 311 (W.D.N.C.1983) (Title IV-D).
 
 
 97
 Finally, nothing in Title IV-D's legislative history can be construed as congressional reluctance to allow section 1983 actions. In 1977 former AFDC recipients in Georgia brought an action against state and federal authorities challenging the collection and distribution of child support payments following the termination of AFDC benefits. See Seagraves v. Harris, 629 F.2d 385 (5th Cir.1980).[8] Soon thereafter, Senator Nunn proposed an amendment to Title IV-D which supported the challenged practices. He referred specifically to the Georgia lawsuit without questioning its propriety. See 123 Cong. Rec. S33865 (Oct. 17, 1977). Senator Nunn's amendment was enacted into law verbatim. Pub.L. 95-171, Sec. 11, 91 Stat. 1357 (1977). This action cannot be consistent with an intent to foreclose section 1983 actions for violations of Title IV-D.
 
 III. Conclusion
 
 98
 There can be no doubt that section 1983 can be used to challenge violations of Title IV-D. The state has failed to carry its burden of demonstrating that Congress intended to foreclose section 1983 actions, and it is clear that families with absent fathers are the intended beneficiaries of Title IV-D and have enforceable rights to effective paternity determinations and child support enforcement procedures.
 
 
 
 *
 Honorable J. Foy Guin, Jr., U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 42 U.S.C. Sec. 602(b)-(c). Section 602(a) requires that the States must establish a plan for aid and services to needy families with children and that the plan be mandatory upon all political subdivisions of the state. Section (b) pertains to approval of the state plans by the Secretary of HHS [hereinafter Secretary], and section (c) deals with the Secretary's duties pertaining to the compilation of data, publishing of findings, and reports to Congress
 
 
 [2]
 42 U.S.C. Sec. 604. Deviation from plan
 
 
 [3]
 Title IV-D of The Act
 
 
 [4]
 42 U.S.C. Sec. 654(4), (6), (9)
 
 
 [5]
 42 U.S.C. Sec. 666(a)(6)
 
 
 [6]
 42 U.S.C. Sec. 666(a)(4)
 
 
 [7]
 42 U.S.C. Sec. 666(a)(3)
 
 
 [8]
 42 U.S.C. Sec. 666(a)(7)
 
 
 [9]
 42 U.S.C. Sec. 603
 
 
 [10]
 42 U.S.C. Sec. 652(a)(4)
 
 
 [11]
 42 U.S.C. Sec. 603(h)
 
 
 [12]
 42 U.S.C. Sec. 602(a)(26)
 
 
 [13]
 42 U.S.C. Sec. 602(a)(8)(A)(vi); 42 U.S.C. Sec. 657(b)
 
 
 [14]
 45 C.F.R. Sec. 232.20(b) (1987)
 
 
 [15]
 These guidelines are binding on judges and other officials unless there is good cause shown
 
 
 [16]
 42 U.S.C. Sec. 602(a)(26)(B)
 
 
 [17]
 42 U.S.C. Sec. 602(a)(26)(A). As the court has noted, except for the first fifty dollars of child support collected each month, which is paid to the family and does not affect the family's AFDC eligibility or decrease any amount otherwise payable as assistance to such family, the state retains support collections to help offset welfare expenditures on the family's behalf
 
 
 [18]
 The application and receipt of benefits was pursuant to statute
 
 
 [19]
 Under the 1988 amendments placement of time limitations for compliance with the statute will prevent undue delay
 
 
 [20]
 Relying on Wright, the en banc court in Brown remanded the case to the district court. 820 F.2d 350, 352 (11th Cir.1987) (en banc)
 
 
 [21]
 For cases holding Congress may fix the terms on which it shall disburse federal money to the states see Oklahoma v. CSC, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970)
 
 
 [22]
 In return for this assignment of rights they receive AFDC aid. This quid pro quo is the mutual consideration which passes between the parties to the contract, and which renders it valid and binding
 
 
 [23]
 "Cooperate" includes the following: (1) appearing at an office of the State or local agency or the child support agency as necessary to provide verbal or written information, or documentary evidence, known to, possessed by, or reasonably obtainable by the applicant or recipient; (2) appearing as a witness at judicial or other hearings or proceedings; (3) providing information, or attesting to the lack of information, under penalty of perjury; and (4) paying to the child support agency any support payments received from the absent parent after an assignment. 45 C.F.R. Sec. 232.12(b)
 
 
 [24]
 In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184, 188 (1970) the court held the Administrative Procedure Act "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.' "
 
 
 [25]
 "The zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke, 479 U.S. at 399, 107 S.Ct. at 757, 93 L.Ed.2d at 769
 
 
 [1]
 In fact, the use of mandatory language alone may be sufficient to find the creation of enforceable federal rights. This court in Gonzalez v. Pingree, 821 F.2d at 1528, relied solely on the existence of mandatory language in 7 U.S.C. Sec. 2020 to hold that individuals have an enforceable right to food stamps. At least one judge on the D.C. Circuit, however, has read Pennhurst more broadly. Edwards v. District of Columbia, 821 F.2d at 659 (opinion of Wald, J.). Judge Wald reads Pennhurst to require a statute to unambiguously create duties in language which "narrowly cabins the discretion of officials, and by the same terms, secures rights to a specific class of people." Id. at 656. This expansive reading of Pennhurst may be precluded by the Supreme Court's interpretation of Pennhurst in School Board of Nassau County v. Arline, 480 U.S. 273, 286 n. 15, 107 S.Ct. 1123, 1130 n. 15, 94 L.Ed.2d 307 (1987), and Wright v. City of Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); see Edwards, 821 F.2d at 668 (Wills, J. dissenting). In Arline, the Court made clear that Pennhurst turned on the fact that the language of the statute was precatory not mandatory. 480 U.S. at 286 n. 15, 107 S.Ct. at 1130 n. 15. Similarly, in Wright, the Court summarily dismissed the argument that the mandatory language concerning rent ceilings in the Fair Housing Act did not create enforceable rights. 479 U.S. at 432-35, 107 S.Ct. at 775-76
 The majority's reliance on Judge Wald's opinion in Edwards, therefore, is troubling. Besides the flawed reasoning on the burden of proof pointed out before, supra, p. 1568, Edwards represents a reading of Pennhurst that has not been adopted by the Supreme Court or this court. Nevertheless, even under the majority's reading of Pennhurst, I believe the statute creates enforceable rights since the statute clearly imposes obligations on the states for the benefit of families with absent parents.
 
 
 [2]
 The regulations are even more specific. The state must maintain an effective system to identify delinquencies in support payments within thirty days and must enforce those delinquencies through a contempt order, garnishment proceedings, proceedings against real property or the other remedial devices listed in the statute. 45 C.F.R. Sec. 303.5
 
 
 [3]
 Section 6010, at issue in Pennhurst, was interpreted to be merely a recommendation by Congress as to the appropriate treatment of mentally retarded individuals. The Supreme Court based its finding that the section did not create enforceable rights on a comparison of section 6010 to other sections (sections 6011, 6033) which did expressly condition receipt of funds on compliance with those sections of the statute. 451 U.S. at 26, 101 S.Ct. at 1544
 A similar comparison can be done in this case. On the one hand, the sections of the statute at issue (sections 654, 666) expressly condition receipt of federal money on compliance with specific conditions. There are, however, two sections of the Act which more closely resemble section 6010 in Pennhurst and may not create enforceable rights. First, the 1984 amendments contained a section entitled "Sense of Congress" in which Congress made "findings" that the states should focus on the important issues of child support, custody and visitation because of the importance of these issues to the health of "our nation's children." H.Conf.Rep. No. 98-925, 98th Cong.2d Sess. at 59, reprinted in 1984 U.S.Code Cong. & Admin.News at 2477. That section closely resembles section 6010 in Pennhurst because it merely encourages the states to reconsider their approach to the issue of family law. Section 667 of the amended act also resembles section 6010 in Pennhurst. Section 667 requires that states establish uniform guidelines with respect to determinations of child support. Although the language of the section mandates the creation of guidelines as a condition for receipt of federal funds, under the majority's reading of Pennhurst the fact that no specific guidelines were mentioned would require a holding that section 667 does not create enforceable rights. But see supra n. 1. Comparing the precatory language of the sense of Congress section and the lack of specific direction in section 667 to the clear language of sections 654 and 666, it is clear that the latter sections create enforceable rights.
 
 
 [4]
 Indeed the section which describes the rise in welfare costs merely sets out the background for the bill. The Senate Report explained that in light of the rise in federal spending on welfare, the regulations promulgated by HEW were inadequate. The purpose of the bill overall (since the bill applied to the entire Social Security Act), therefore, might be said to be a clarification or refinement of the requirements for the programs. S.Rep. No. 93-1356, reprinted in 1974 U.S.Code Cong. & Admin.News at 8135-36
 
 
 [5]
 This case is further distinguished from Pennhurst in that the Court in Pennhurst relied on the fact that the small amount of money appropriated by Congress contradicted the argument that the statute intended to order massive expenditures on the part of the state. In this case, Congress actually raised the already substantial federal funding in order to assure that the states would comply with Title IV-D
 
 
 [6]
 I do not deny that the fact that support enforcement reimburses the state and federal government for AFDC expenditures is an advantage to this Act. However, as the House Committee on Ways and Means stated in recommending adoption of the Child Support Enforcement Amendments of 1984, the success of Title IV-D could not be measured in "terms of AFDC savings due to collections on behalf of recipients" because the "objectives behind the program are greater than merely recouping federal and state AFDC expenditures." H.R.Rep. No. 98-527, 98th Cong., 1st Sess., at 2930
 
 
 [7]
 After this case was briefed, Congress passed a law revamping the existing welfare laws. Of significance to this case is that Congress required the states to adopt child support guidelines which will presumptively determine the amount of an award. Pub.L. No. 100-485, Sec. 103, 102 Stat. 2346 (1988). In addition, wage withholding must be automatic in most new support awards. Pub.L. No. 100-485, Sec. 101, 102 Stat. 2343. These new requirements support a finding that Title IV-D creates enforceable rights
 
 
 [8]
 The question of whether section 1983 could serve as a basis for a claim of a violation of Title IV-D was not addressed by the court in Seagraves. Although there was an issue of whether there was a jurisdictional base for the claim in Seagraves, that issue was solved by allowing the plaintiffs to amend their complaint to add a constitutional claim. Before the amendment, the plaintiffs sought to establish jurisdiction under 28 U.S.C. Sec. 1343 by alleging that the state's violation of the Social Security Act violated the Supremacy Clause. 629 F.2d at 389. That basis was not appropriate since the Supreme Court had held in Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 99 S.Ct.1905, 60 L.Ed.2d 508 (1979), that section 1343 did not confer subject matter jurisdiction for violations of the Supremacy Clause. The next year, however, the Court held in Maine v. Thiboutot, 448 U.S. at 8, 100 S.Ct. at 2506, that violations of the Social Security Act could be brought under Sec. 1983 and that the jurisdictional base is 28 U.S.C. Sec. 1331. Although not discussed in Seagraves, it is clear that subject to the two exceptions to Thiboutot, claims of violations of federal statute by state actors brought under Sec. 1983 are cognizable in federal court