Brenda **CARELLI**, et al., Plaintiffs,

v.

Robert **HOWSER**, et al., Defendants.

**No. C-1-89-319.**

United States District Court, S.D. Ohio, W.D.

Feb. 14, 1990.

Mark Cardosi, Trial Counsel, Frank J. Wassermann, Legal Aid Soc. of Clermont County, Batavia, Ohio, William H. Fraser, pro hac vice, Toledo, Ohio, for plaintiffs.

John Woliver, Batavia, Ohio, for Robert Howser, Harmon Neal, Earl Berger, Judge William B. Stapleton and Deborah Parker.

Alan P. Schwepe, Asst. Atty. Gen., Robert Frankart, Dept. of Human Services, Columbus, Ohio, for Patricia Barry, Elizabeth Lightle.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

SPIEGEL, District Judge.

This matter is before the Court on the motion to dismiss of the defendants Patricia Barry and Elizabeth Lightle (doc. 10) and the motion to dismiss of the defendants Robert Howser, Harmon Neal, Earl Berger, Hon. William Stapleton, and Deborah Parker (doc. 30). The plaintiffs have filed a memorandum in opposition (doc. 11) to which the defendants have replied (doc. 15), and both parties have filed additional plead-

ings bringing recent decisions to the Court's attention (docs. 19, 25, 32 & 33).

The plaintiffs' amended complaint seeks declaratory and injunctive relief under 42 U.S.C. § 1983 for the violation of their rights under Title IV–D of the Social Security Act, 42 U.S.C. §§ 651–669. The plaintiffs are all mothers who are eligible for child support enforcement services. The defendants are officials of the State of Ohio and Brown County charged with the enforcement of Ohio's child support plan in Brown County which was adopted pursuant to Title IV–D. The plaintiffs allege that the defendants have failed to comply with federal statutes and regulations which require them to provide efficient services to locate absent parents, establish paternity, establish support obligations through court order, and enforce existing support orders. As a result of these failures, the plaintiffs allege that they have been deprived of child support to which they are entitled.

The defendants move that the amended complaint be dismissed on four grounds. First, the defendants argue that the plaintiffs may not seek a remedy for violations of Title IV–D under 42 U.S.C. § 1983, because Title IV–D does not create enforceable rights and because Title IV–D forecloses such a remedy. Second, the defendants assert that the amended complaint does not present a case or controversy. Third, the defendants argue that the Court should decline to entertain this case as a declaratory judgment action. Finally, the defendants contend that this action is barred by the eleventh amendment.

## TITLE IV–D

The State of Ohio participates in the federal Aid to Families with Dependent Children (AFDC) program established by Title IV–A of the Social Security Act, 42 U.S.C. §§ 601–617. The program is a federal-state cooperative effort administered by the states. The AFDC program provides funds to states which have implemented plans to aid needy families with children deprived of parental support due to death, disability, or desertion. 42 U.S.C. §§ 601 & 606(a). The purpose of the program is to encourage the care of dependent children in their own homes or in the homes of relatives and to thereby strengthen family life. 42 U.S.C. § 601. In order to receive AFDC funds, the state must comply with federal requirements. 42 U.S.C. § 602. One such requirement is that the state must adopt a plan for child support enforcement in compliance with the standards set forth in Title IV–D and operate a child support enforcement program in substantial compliance with that plan. 42 U.S.C. § 602(a)(27). The Secretary of Health and Human Services must approve the state plan in order for the state to receive federal funding. 42 U.S.C. § 602(b). Once a plan complying with Title IV–D has been approved, the Secretary is responsible for conducting an audit of the state program at least once every three years to determine whether the actual operation of such program complies with the requirements of Title IV–D. 42 U.S.C. § 652(a)(4). If the program is found to not substantially comply with these requirements then the Secretary must reduce the state's funding according to a formula set out in 42 U.S.C. § 603(h).

Title IV–D sets forth the requirements which state plans for child support enforcement must meet. The purpose of Title IV–D is to provide programs "enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for aid under part A) for whom such assistance is requested." 42 U.S.C. § 651. States are required to provide child support enforcement services to families that receive AFDC benefits as well as families that do not. Families receiving AFDC are required to assign their rights to support payments to the state. 42 U.S.C. § 602(a)(26)(A). Families that receive AFDC are entitled to the first $50 in support payments collected each month under a Title IV–D program. After the family has been paid the first $50, the state may retain additional support payments collect-

ed as reimbursement for AFDC payments. If the amount of support collected exceeds the amount retained as reimbursement for AFDC plus $50, then the family is entitled to that additional amount. 42 U.S.C. § 657(b). Families must be notified at least annually of the amount of support payments collected by the state. 42 U.S.C. § 654(5)(A). Families that do not receive AFDC are entitled to the entire amount of support collected by the state.

■ Section 1983 authorizes suits against those acting under the color of state law for violations of federal statutes as well as for violations of the federal Constitution. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (holding that plaintiffs may bring an action under § 1983 for violation of their right to receive AFDC benefits under Title IV–A of the Social Security Act). Section 1983 actions are not limited to those cases in which a federal civil rights statute has been violated, but include all cases in which a federal statute has been violated. *Id.* Two exceptions exist to this general rule. First, a plaintiff may not bring a cause of action under § 1983 for violation of a federal statute if that statute does not create enforceable "rights" in the plaintiff. Second, a plaintiff may not bring suit under § 1983 for violation of a federal statute if Congress foreclosed private enforcement of that statute in the enactment itself. *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

We are aware of only two cases that directly address whether a plaintiff may bring a suit under § 1983 for a violation of Title IV–D of the Social Security Act. In *Wehunt v. Ledbetter*, 875 F.2d 1558 (11th Cir.1989), the Eleventh Circuit ruled that the plaintiffs could not maintain an action against the State of Georgia and the Department of Health and Human Services under § 1983 for a violation of Title IV–D. The Eleventh Circuit held that Title IV–D does not create enforceable rights, and

therefore did not address the issue of foreclosure. In determining whether Title IV–D creates enforceable rights, the court posed the question contained in the first prong of the four-part test for determining whether an implied private cause of action exists set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)—whether the statute was enacted for the "especial benefit" of AFDC families. The court concluded that Title IV–D was not enacted for the benefit of particular families but instead was intended to benefit the general public by recovering funds distributed under Title IV–A and returning them to the federal and state treasuries. The Court concluded that the legislative history of Title IV–D indicates that "Congress was primarily concerned with collecting child support in order to reduce the welfare rolls." *Id.* at 1565. It concluded that "the goal of Title IV–D was to immediately lower the cost to the taxpayer as well as to lessen the number of families enrolling in welfare in the future—benefits to society as a whole rather than specific individuals." *Id.* The court also noted that AFDC recipients do not request child support enforcement services, instead they assign their rights to child support payments to the state in return for AFDC benefits giving the state the opportunity to recoup the financial drain imposed by the welfare system on the state and federal governments.

Judge Clark wrote a strong dissent in *Wehunt* based on his objections to the analysis employed by the majority and his objections to the majority's interpretation of Title IV–D. While Judge Clark recognized that there was some value in analogizing to the implied private cause of action cases in determining whether enforceable rights are created by Title IV–D, he argued that the majority's reliance on those cases was erroneous to the extent that the majority adopted the allocation of the burden of proof from those cases. Judge Clark stated that while the burden of proof is on the plaintiff in an implied cause of action suit, it is on the state defendant in a § 1983 suit. Therefore, he argued that the majority opinion was invalid to the extent that it placed the burden of proof on the plaintiff

to show a cause of action for the violation of Title IV–D. While the majority did analogize heavily to the implied private cause of action cases in determining whether an enforceable right existed, it is unclear where they allocated the burden of proof. Judge Clark also disagreed with the majority's interpretation of the purpose of Title IV–D. He argued that while it was undoubtedly true that Title IV–D allows the state and federal governments to recover money spent on AFDC, the actual goal of the statute was to benefit needy children and their families rather than the Treasury and the general public. Judge Clark found the intent to benefit children and their families in both the statute's language and the legislative history. He found that Title IV–D is phrased in mandatory rather than precatory terms and requires the states to comply with specific procedures in order to receive AFDC funds which indicates that Congress intended to create enforceable rights in the children and their families. He also criticized the majority for their selective reading of the legislative history, and argued that a full reading of the legislative history indicates that the primary intent of Title IV–D was to benefit children and their families. Having found that Title IV–D creates enforceable rights, Judge Clark went on to examine whether Congress had foreclosed actions under § 1983 in the enactment of Title IV–D itself. Judge Clark noted that Title IV–D does not provide for private judicial or administrative remedies as did the other statutes that the Supreme Court has held to foreclose actions under § 1983. He then concluded that Title IV–D's audit and withholding provisions are insufficient to support the conclusion that Congress intended to foreclose § 1983 actions.

The only other case we are aware of that addresses whether a plaintiff may bring a suit under § 1983 for a violation of Title IV–D is *Beasley v. Ginsberg*, Civ. No. H–86–619 (PCD), slip op., —— WL —— (D.Conn. October 3, 1989). In *Beasley*, Judge Dorsey found that the state defendants did not meet their burden of proving that Congress intended to foreclose a § 1983 remedy under Title IV–D. Judge Dorsey cited Judge Clark's dissent in *Wehunt* as persuasive on this point. He held that neither Title IV–D's language nor its comprehensive scheme for enforcement raised the clear inference that Congress had intended to foreclose a § 1983 remedy. *Id.* at 19. Judge Dorsey did not expressly address whether Title IV–D creates enforceable rights.

 The defendants argue that the plaintiffs may not seek a remedy for violations of Title IV–D under § 1983, because Title IV–D does not create enforceable rights and because Title IV–D forecloses such a remedy. We believe that Judge Clark mistakenly criticized the *Wehunt* majority's allocation of the burden of proving that enforceable rights exist. In *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 423, 107 S.Ct. 766, 770–71, 93 L.Ed.2d 781 (1987), the Supreme Court stated that "if there is a state deprivation of a 'right' secured by a federal statute, § 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." We read this language as placing the burden of proving that enforceable rights exist in a § 1983 action on the plaintiffs. Once the plaintiffs have met this burden, however, the burden is on the state defendants to show that Congress intended to foreclose a § 1983 remedy. While we believe that Judge Clark was mistaken in allocating the burden of proving that enforceable rights exist, we find his interpretation of Title IV–D to be persuasive. Therefore, we hold that the plaintiffs have sustained their burden of proving that Title IV–D creates "rights" that they may enforce under § 1983.

In determining whether Title IV–D creates enforceable rights our primary focus must be the intent of Congress. We must consider whether the statutory language creates specific and definite benefits phrased in terms of the persons asserting the right to those benefits, and whether the statutory language mandates the provision of those benefits rather than merely encourages their provision. We may also

look to the legislative history and other traditional aids to statutory interpretation. *Wright*, 479 U.S. at 433, 107 S.Ct. at 775–76 (O'Connor, J., dissenting).

The language of Title IV–D is clearly mandatory rather than precatory. The Social Security Act makes it clear that a state *must* have a Title IV–D plan in effect if it participates in the AFDC program. 42 U.S.C. § 602(a)(27). If a state fails to substantially comply with its Title IV–D plan there is a mandatory withholding of federal funding. 42 U.S.C. § 603(h). Title IV–D itself contains mandatory requirements that the states must meet. These requirements are specific and definite and directly benefit the children and families entitled to Title IV–D services. Title IV–D requires states to establish the paternity of children born out of wedlock. 42 U.S.C. § 654(4)(A). States must secure payments for abandoned children and their remaining parent. 42 U.S.C. § 654(4)(B). The states must forward the first $50 collected each month to the AFDC families. 42 U.S.C. § 657(b)(1). Also, states must provide notice of the amount collected to each family at least annually. 42 U.S.C. § 654(5)(A). Title IV–D also requires the states to pass laws creating specific remedial devices to ensure more effective child support, including wage withholding, reduction of tax refunds, use of liens against real and personal property, and requiring the absent parent to give security or post bond. 42 U.S.C. § 666(a)(1)–(9). Finally, the states must comply with other requirements that the Secretary deems necessary to the establishment of an effective Title IV–D program. 42 U.S.C. § 654(13). The Secretary has promulgated regulations stating that states must locate absent parents, establish support obligations, attempt to establish paternity, and enforce support obligations. 45 C.F.R. § 303.3–.6. All of these provisions are set forth in mandatory rather than precatory terms. They also create specific and definite benefits that are phrased in terms of the children and families who will receive them.

Nevertheless, the defendants argue that no enforceable rights are created by Title IV–D because the statute's legislative history indicates that children and their families are only indirect beneficiaries of Title IV–D and that Congress intended the primary beneficiaries to be the state and federal treasuries. We find the defendants interpretation of congressional intent to be contradicted by both the text of the statute and its legislative history. The statute itself states that federal appropriations for Title IV–D programs are for "the purpose of enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for aid under part A) for whom such assistance is requested." 42 U.S.C. § 651. The clear language of this provision focuses on children; it contains no language concerning the recapture of AFDC funds.

An even more revealing indication that Congress' primary intent in enacting Title IV–D was to benefit children is that Congress expressly required states to provide Title IV–D services to non-AFDC families in the 1984 amendments. During the debate on the floor of the House prior to the adoption of the 1984 amendments, Representative Conable stated as follows:

A major focus in the child-support debate during the 98th Congress has been the underlying purpose and intent behind the child-support enforcement program. Some maintained that it should aim primarily at recovering AFDC expenses incurred because families without child support must rely on welfare. Others contended that this Federal program ought to be available as a service to all families in need of assistance in securing child support, regardless of whether they receive welfare or not. This conference agreement reflects the rationale stated in both House and Senate bills which reaffirms that the program should be available to all who need services. This is an important statement of our intent that the Federal Government should assist in

the costs of putting into place a nationwide efficient and effective child-support enforcement system that enables all children in need of support to receive timely and expedient assistance.

130 Cong.Rec. H23040 (daily ed. Aug. 8, 1984) (statement of Rep. Conable). Providing services to families who are not a "drain on the welfare system" and who do not assign their right to support payments to the state reflects a primary emphasis on aiding children rather than on replenishing state and federal treasuries. The only benefits in providing services to non-AFDC families flow to the families themselves, no benefits flow to the state and federal treasuries.

Other provisions of Title IV–D also reflect a primary emphasis on children and their families rather than on recovering welfare expenditures. Section 654(4)(A) requires states to establish the paternity of children born out of wedlock unless it is in the best interest of the child not to do so. Congress obviously placed the child's interests above the state's interest in identifying fathers and recovering welfare expenditures. Congress also provided that the first $50 of support collected each month would go to the families in addition to the AFDC payments they received rather into the state treasuries. The statute also requires the states to provide annual notice to families of the amount of support payments collected. 42 U.S.C. § 654(5)(A). We can only presume from these provisions that Congress intended to directly benefit these families.

The legislative history does not dictate any different conclusion. It is the defendants' contention that the legislative history of Title IV–D demonstrates that Congress' primary intention in creating the Title IV–D program was to recoup welfare payments made under Title IV–A. A comprehensive reading of the legislative history, however, reveals that while Congress was concerned with creating a cost effective program and economic incentives for the states to operate efficient child support programs, Congress' primary focus was on further aiding children to secure their rights to have their fathers identified and

to receive support from them. This primary concern was succinctly expressed by Senator Dole when he stated: "It is important to remember that the Federal–State child support program is designed not to produce revenue for the States and local jurisdictions—or for the Federal Government. The goal of this program is to collect support for children at a reasonable cost." 130 Cong.Rec. S9843 (April 25, 1985) (statement of Sen. Dole).

The primary emphasis on securing the rights of children to receive child support from their parents was also reflected in the Committee reports accompanying the enactment of Title IV–D in 1975 and the 1984 amendments. The Senate Committee on the 1975 bill stated as follows:

> The Committee believes that all children have the right to receive support from their fathers. The Committee bill ... is designed to help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, *more importantly,* as an effective support system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup.

S.Rep. No. 93–1356, 93rd Cong., 2d Sess. *reprinted in* 1974 U.S.Code Cong. & Admin.News 8133, 8146 (emphasis added). The majority in *Wehunt* read this passage to conclude that any benefits to children as the result of Title IV–D were merely incidental to the lower welfare costs to the taxpayer, we read this passage to mean exactly the opposite. The Committee also squarely placed the emphasis on the rights of children when it stated:

> The original laws imposing support of the child on a parent were enacted solely to prevent the community from having the child as a public charge.... In taking the position that a child born out of wedlock has a right to have its paternity ascertained in a fair and efficient manner, the committee acknowledges that legislation must recognize the interest

primarily at stake in the paternity action to be that of the child.

*Id.* at 8155. The Senate Committee on the 1984 amendments stated that amendments should be enacted to ensure "that all children in the United States who are in need of assistance in securing financial support from their parents will receive assistance regardless of their circumstances, and for other purposes." S.Rep. No. 98–387, 98th Cong., 2d Sess. *reprinted in* 1984 U.S.Code Cong. & Admin.News 2397, 2397. Therefore, the legislative history demonstrates that Congress' primary purpose was to aid the children and families that would benefit from Title IV–D. The benefits to the state and federal treasuries appear to have been of only secondary importance to Congress.

Having found that the text of the statute and its legislative history indicate that Congress' primary intention in enacting Title IV–D was to secure support enforcement services for children and their families, we find that Title IV–D creates enforceable rights in the plaintiffs.

■ The defendants also argue that even if Title IV–D does create enforceable rights, Congress has foreclosed any private enforcement action under § 1983. We note at the outset that courts should "not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423–24, 107 S.Ct. 766, 770–71, 93 L.Ed.2d 781 (1987). The defendants argue that Congress' intent to foreclose a right of private enforcement under § 1983 can be found in the extensive auditing powers granted to the Secretary. The defendant argues that the Secretary's oversight authority was intended by Congress to be the exclusive remedy for a state's failure to comply with the requirements of Title IV–D. The Supreme Court rejected a similar argument in *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). The defendant in *Wright* argued that the oversight authority of the Department of Housing and Urban Development (HUD) under the Brooke Amendment to the Housing Act of 1937 foreclosed private enforcement of the provisions of that Act under § 1983. The Court rejected this argument holding that although "HUD undoubtedly has considerable authority to oversee the operation of the PHAs[,] [w]e are unconvinced ... that respondent has overcome its burden of showing that 'the remedial devices provided in [the Housing Act] are sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983.'" *Id.* at 424, 107 S.Ct. at 771. The Court held that HUD's generalized powers to audit, enforce annual contributions contracts, and cut off federal funds are insufficient to indicate congressional intent to foreclose a § 1983 action. *Id.* at 428, 107 S.Ct. at 773. The Court also based its holding on the fact that there was no express indication that exclusive enforcement authority was vested in HUD, and on the fact that congressional and agency action indicated that private enforcement actions were anticipated. *Id.* at 424–25, 107 S.Ct. at 771–72.

The defendants in the present case attempt to distinguish *Wright* by arguing that the oversight authority of HUD in *Wright* is less comprehensive than that of the Secretary in the present case. We find that the administrative scheme of enforcement created by Congress under Title IV–D is not sufficiently different from that under the Housing Act in the *Wright* case to justify a different conclusion as to Congress' intent to foreclose a § 1983 action. The fundamental difference between the administrative enforcement schemes that have been held to foreclose private enforcement under § 1983 and those that do not is that those that foreclose § 1983 actions provide not only for administrative audits but also for express private administrative and judicial remedies. In those cases, the Court has held that the private remedies which allowed plaintiffs to pursue their substantive rights under the statute were intended by Congress to foreclose all other private remedies. *Compare Wright,* 479 U.S. at 418, 107 S.Ct. at 766 (holding that § 1983 action was not foreclosed where the statute did not provide for private judicial

remedies) *with Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (holding that § 1983 action was foreclosed where the statute contained private citizen suit provisions and allowed any "interested person" to seek judicial review of the EPA administrator's decisions) *and Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (holding that § 1983 action was foreclosed where the statute contained procedures to ensure that hearings conducted by the states were fair and adequate and provided for judicial review of state administrative decisions). Title IV–D does not provide for any such express private remedies which would indicate congressional intent to foreclose resort to § 1983. Furthermore, the existence of state administrative remedies has been held to not normally foreclose § 1983 actions. *Wright,* 479 U.S. at 427–28, 107 S.Ct. at 772–73.

The other factors considered in *Wright* also support the conclusion that Congress did not intend to foreclose § 1983 actions. The defendants have been unable to point to any express indication of Congress' intent to foreclose action under § 1983. Also, there is evidence that Congress anticipated private enforcement actions. Judge Clark noted the following in his dissent in *Wehunt:*

> Finally, nothing in Title IV–D's legislative history can be construed as congressional reluctance to allow section 1983 actions. In 1977 former AFDC recipients in Georgia brought an action against state and federal authorities challenging the collection and distribution of child support payments following the termination of AFDC benefits. *See Seagraves v. Harris,* 629 F.2d 385 (5th Cir.1980). Soon thereafter, Senator Nunn proposed an amendment to Title IV–D which supported the challenged practices. He referred specifically to the Georgia lawsuit without questioning its propriety. *See* 123 Cong.Rec. S33865 (October 17, 1977). Senator Nunn's amendment was enacted into law verbatim. Pub.L. 95–171, § 11, 91 Stat. 1357 (1977). This action cannot be consistent with an intent to foreclose section 1983 actions for violations of Title IV–D.

*Wehunt,* 875 F.2d at 1576–77 (Clark, J., dissenting).

Therefore, we find that Congress did not intend to foreclose the use of § 1983 actions to enforce the provisions of Title IV–D.

## CASE OR CONTROVERSY

The defendants argue that there is a lack of a case or controversy between the parties because the plaintiffs cannot demonstrate that they have suffered an actual or threatened injury as a result of the defendants' failure to comply with the requirements of Title IV–D. The defendants argue that it is speculative whether support payments will be collected regardless of whether or not the state makes any effort to enforce the support obligations. We find an actual injury to the plaintiffs in the deprivation of their rights to obtain services to establish and enforce support orders under Title IV–D. The fact that support payments may or may not be collected regardless of the state's enforcement efforts is not relevant. Therefore, we find that the plaintiffs have stated a case or controversy as required by Article III of the Constitution.

## DECLARATORY RELIEF

The defendants argue that this Court should exercise its discretion to hear declaratory judgment actions and refuse to entertain the plaintiff's action. The Sixth Circuit Court of Appeals has set forth the factors to be considered when determining whether a declaratory judgment action is proper as follows:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our

federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better of more effective. *Grand Trunk Western Railroad Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir.1984). Having carefully considered these factors, we conclude that this action is appropriate for declaratory relief. The defendants argue that the alternative state remedies available to the plaintiffs in this case should cause this Court to decline to entertain this action. The defendants contend that the plaintiffs should pursue the administrative hearings available to them before the Ohio Department of Human Services rather than this action in federal court. However, we note that these administrative hearings do not provide for class grievances. Ohio Admin. Code § 5101:1–29–131. Furthermore, as we have already noted that "the existence of a state administrative remedy does not ordinarily foreclose resort to § 1983." *Wright*, 479 U.S. at 427–28, 107 S.Ct. at 773. Therefore, we conclude that the plaintiffs' class action is an appropriate declaratory judgment action.

### ELEVENTH AMENDMENT

 The defendants argue that the plaintiffs' claims are barred by the eleventh amendment. We find this argument to be without merit. It is well settled that an action to enjoin state officials from an ongoing violation of federal law is not barred by the eleventh amendment. *Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In the present case, the plaintiffs seek injunctive and declaratory relief against the defendants in their official capacities for the violation of Title IV–D. Therefore, we conclude that the plaintiffs' action is not barred by the eleventh amendment.

### CONCLUSION

We conclude that all of the grounds for dismissal asserted in the defendants' motions are without merit. However, we believe the issue of whether a private action under § 1983 may be brought to enforce the provisions of Title IV–D involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of this litigation. Therefore, we hereby certify this decision for an interlocutory appeal under 28 U.S.C. § 1292.

Accordingly, the defendants' motions to dismiss are hereby denied.

SO ORDERED.