Velda HOWE, Theresa Taken Alive, on Behalf of themselves, their children, and all others similarly situated, Plaintiffs,

v.

James ELLENBECKER, in his capacity as Secretary of the South Dakota Department of Social Services; Terry Walter, Program Administrator, South Dakota Office of Child Support Enforcement, and Louis Sullivan, M.D., in his capacity as Secretary of the United States Department of Health and Human Services, Defendants.

Civ. No. 90-3007.

United States District Court, D. South Dakota, C.D.

Sept. 18, 1991.

Krista Clark, Dakota Plains Legal Services, Mission, S.D., B.J. Jones, Dakota Plains Legal Services, Fort Yates, N.D., for plaintiffs.

Mark L. Bratt, Asst. Atty. Gen., David L. Braun, Sp. Asst. Atty. Gen., Office of Legal Services/Dept. of Social Services, Pierre, S.D., for James Ellenbecker.

David L. Zuercher, Asst. U.S. Atty., Pierre, S.D., Lucille Meis, Office of Chief Counsel, Health and Human Services, Denver, Colo., for Federal defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

On February 8, 1990, plaintiffs Velda Howe and Theresa Taken Alive filed this class action against defendants James Ellenbecker, Secretary of the South Dakota Department of Social Services, Terry Walter, Program Administrator of the South Dakota Office of Child Support Enforcement and Louis Sullivan, M.D., Secretary of the U.S. Department of Health and Human Services (HHS). Plaintiffs are custodial parents of children who have absent parents residing on Indian reservations within South Dakota. Plaintiffs bring this action on behalf of themselves, their children, and all others similarly situated, claiming that they have been denied child support collection services secured them under Title IV–D of the Social Security Act, the Child Support and Establishment of Paternity Act, 42 U.S.C. § 651 *et seq.*[1] Trial was held before the Court on July 23–25, 1991.

## FACTS

*Plaintiff's Background*

Velda Howe is an enrolled member of the Crow Creek Sioux Indian Tribe and resides with her four children in Chamberlain, South Dakota. Howe is a present recipient of Aid to Families with Dependent Children

---

**1.** The matter was certified as a class action by order filed October 24, 1990.

(AFDC) for herself and her twelve year old son, Daniel. As a condition of receiving AFDC, Howe was required to cooperate with the state in establishing her child's paternity, in securing child support for her children, and in assigning to the state the right to receive child support for her son. Howe expressed a willingness to cooperate with the state in establishing paternity and collecting support, and identified the putative father of Daniel for the State Office of Child Support Enforcement. Howe claims that despite her cooperation and repeated requests, the state has made no effort to establish the paternity of Daniel because the putative father lives on a South Dakota Indian reservation.

Theresa Taken Alive receives AFDC from the State of South Dakota for her minor child, Caroline. Taken Alive has custody of Caroline pursuant to a Judgment and Decree of Divorce from the Standing Rock Sioux Tribal Court. This decree requires that Caroline's father pay child support in the amount of $300.00 per month to Theresa Taken Alive. Taken Alive has informed the State Office of Child Support Enforcement of the decree of divorce but claims that the state has refused to attempt to collect child support from Caroline's father because he lives on a South Dakota Indian reservation.

Plaintiffs claim that the state defendants' refusal to assist them in obtaining child support and the federal defendant's refusal to provide matching funds to assist the state in child support enforcement violates Title IV–D of the Social Security Act and denies plaintiffs their right to child support collection services on the basis of their race, in violation of the equal protection clause of the fourteenth amendment and the due process clause of the fifth amendment to the United States Constitution.

## AFDC AND TITLE IV–D

AFDC is a federal-state cooperative effort administered by the states. The program provides monetary payments from the state to financially needy families, which include children deprived of parental support due to death, disability or deser-

tion. 42 U.S.C. § 601 *et seq.* States are not required to participate in the AFDC program but, if they do so, they must operate the program in compliance with the statutory requirements and the regulations promulgated by the Secretary. One of these requirements is that the state have a plan in effect for child support collection which meets the standards set forth in Title IV–D of the Social Security Act. 42 U.S.C. § 651 *et seq.; See also Wehunt v. Ledbetter,* 875 F.2d 1558, 1559–60 (11th Cir.1989), *cert. denied sub nom. Brown v. Ledbetter,* —— U.S. ——, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990); *Id.* at 1569 (Clark, J., dissenting).

The federal government has made efforts since 1950 to require that absent parents support their children. The early attempts were near-complete failures. *Wehunt,* 875 F.2d at 1569. In 1974, Congress enacted the Social Security Amendments of 1974 which radically revised the previous law. This new law provided for increased matching funds and incentive payments to local governmental units to improve their enforcement of support orders. The 1974 changes also required families to assign their child support payments to the state as a condition of receiving AFDC. *Id.* at 1569.

In 1984, a second set of changes in the child support enforcement requirements was instituted to strengthen Title IV–D. These changes required states to pass laws for mandatory wage withholding and liens and provided for federal tax withholding availability and access to Federal Parent Locator Services. *Id.* at 1570. These 1984 amendments were "intended to ensure that 'all children in the United States who are in need of assistance in securing financial support from their parents will receive assistance regardless of their circumstances.'" *Id.* quoting S.Rep. No. 98–387, 98th Cong., 2nd Sess., at 1 U.S.Code Cong. & Admin.News 1984, p. 2397. This also provided that paternity establishment services be provided to both AFDC and non-AFDC recipients. *Id.*

The Deficit Reduction Act of 1984 also had an effect on Title IV–D. This act

provided that when a non-custodial parent of a child receiving AFDC makes support payments to the state, the first fifty dollars collected would be paid to the family without affecting the amount of assistance it received. 42 U.S.C.S. § 657(b)(1) (1985).

States must comply with the Title IV–D child support enforcement regulations or they risk the withholding of federal matching funds. The state is required to undertake the establishment of paternity and the enforcement of support obligations for all AFDC children and non-recipients as well. The state must comply with the regulations promulgated by the Secretary, including a time frame within which states must respond to requests for support enforcement assistance. *Wehunt,* 875 F.2d at 1561.

The Secretary of the U.S. Department of Health and Human Services is responsible for implementing state plans and establishing regulations for the Title IV–D program. 42 U.S.C.S. § 652 (1985). The state plans are required by statute to be in effect in all political subdivisions of the state, and to provide for entering into cooperative arrangements with appropriate courts and law enforcement officials. 42 U.S.C.S. § 654 (1985). The state plans are further required to provide child support collection and paternity determination services for AFDC children, for foster children, and for any individual not otherwise eligible for services. *Id.*

Neither the statute nor the regulations enacted by the Department of Health and Human Services consider the question of how states are to operate child support collection schemes in non-Pub.L. 280 states where Indian reservations exist. There are no regulations exempting states from providing support enforcement services to Indian families whose absent parent resides on an Indian reservation and there is no authorization for Indian Tribes to provide AFDC programs on the reservation.

The Secretary has interpreted Title IV–D and the regulations promulgated by HHS in developing a policy that deters states from using tribal courts to assist in child support collections unless the tribal court utilizes tribal or state law that conforms with Title IV–D. Under this policy, the state is encouraged to enter into cooperative agreements with the tribes to provide services on the reservations. The states may enter into these agreements with a tribe and provide services as long as the tribe has enacted tribal law or agreed to use state law which complies with Title IV–D in those areas in which the service is to be provided. If no cooperative agreement exists that ensures compliance with Title IV–D, the states do not receive federal funding for child support collection actions taken against an absent parent under the jurisdiction of the tribe.[2] At present, the state does not have a cooperative agreement with any tribe in South Dakota.

*South Dakota Child Support Enforcement Procedures*

The South Dakota Office of Child Support Enforcement (OCSE) consists of approximately 60 employees under the direction of Program Administrator Terry Walter. In addition to the OCSE employees, OCSE contracts with over 50 states attorneys and utilizes the services of special assistant attorneys general to provide legal assistance to persons seeking child support enforcement services. OCSE is funded largely through federal matching funds, through its share of child support collected and through incentive grants offered by the federal government. OCSE handles over 23,000 cases, assisting AFDC families, non-AFDC families and foster

---

**2.** For example, federal funding would not be available for the following activities:

　　1) Where the state has an agreement with the tribe that allows tribal personnel to pursue child support enforcement activities against persons who are within tribal jurisdiction, applying a tribal code which does not conform to Federal IV–D requirements.
　　2) Where the state has an agreement with the tribe that allows state or county IV–D personnel to pursue child support enforcement activities against persons who are within tribal jurisdiction applying a tribal code which does not conform with Title IV–D requirements.
　　3) Where the state, without an agreement with the tribe, pursues child support enforcement activities against persons who are within tribal jurisdiction through utilization of tribal courts which do not apply law which conforms with Title IV–D.

children in collecting child support payments. Of these 23,000 cases, over 5,000 involve absent Indian parents who live and work on the reservation.

OCSE follows a basic four step approach to child support enforcement cases when the absent parent lives or works in South Dakota but not within an Indian reservation. Upon receiving an application from a parent requesting collection assistance, OCSE first attempts to locate the absent parent. OCSE then sends the absent parent a notice of support debt asking the parent to provide OCSE with financial data so that they can determine the amount owed by the absent parent. OCSE next attempts to obtain a stipulation from the absent parent admitting paternity and agreeing to pay the amount owed. Finally, if the absent parent will not stipulate to paternity or to the amount owed, the case is turned over to legal counsel who attempt to obtain paternity determinations and support orders through the state courts.

In cases where the absent parent is an Indian who lives and works on the reservation, OCSE locates the absent parent and asks him or her to stipulate to paternity and to child support payment obligations. However, because state courts do not have jurisdiction over Indians residing on the reservations, the state is unable to pursue these parents through use of the state courts. The state has attempted to enforce state court orders on the reservation but has had little success because of the jurisdictional barriers. The state does not utilize tribal courts to pursue absent parents, in part because the federal government has notified the state that federal matching funds would not be available for pursuing child support claims through the tribal court system.[3] When the state is audited by the federal government, these cases are not considered in determining whether the state has complied with Title IV–D requirements. South Dakota has not been sanctioned by the federal government for noncompliance with federal regulations in the treatment of cases where the absent parent lives and works on the reservation.

*Tribal Court Systems*

There are nine tribes located within the boundaries of South Dakota. Each of these tribes operates a tribal court system which has jurisdiction over tribal members. Judges from the Standing Rock Sioux Tribe, the Cheyenne River Sioux Tribe, the Oglala Sioux Tribe and the Rosebud Sioux Tribe all testified at trial that these tribal courts were open courts in which the state may properly bring paternity and child support actions against Indian parents living on the reservations. There were no facts presented which would indicate that any South Dakota Indian Tribal court would prohibit the state from utilizing the court for child support enforcement orders. Each of the tribes has separate tribal codes; however, none of the tribes have laws that fully comply with Title IV–D.

Plaintiffs presented evidence that, from 1983 to 1990, the North Dakota Office of Child Support Enforcement contracted with Maury Thompson, States Attorney for Sioux County, North Dakota, to provide child support enforcement services through the Standing Rock Sioux Tribal Court. The Standing Rock Reservation is located within both North and South Dakota. Thompson was successful in establishing paternity and obtaining support orders but, because of the unemployment and poverty on the reservation, was less successful in collecting under the support orders. However, because of his efforts in obtaining the orders, the state was able to use enforcement techniques such as federal tax intercept to collect some of the support money due. North Dakota received federal matching funds to assist in paying for the contract with Thompson. The contract was terminated in January, 1990 when HHS announced that it would no longer provide matching funds for child support enforcement services performed through tribal courts that did not fully comply with Title IV–D. In addition to the contract with

---

**3.** There was evidence presented at trial that on at least one occasion, the state threatened to sanction an individual who had not made attempts on her own to obtain a child support order through a tribal court.

Thompson, the North Dakota OCSE also contracted with other attorneys to provide child support enforcement services through other tribal courts in North Dakota. Through the use of these contracts, the North Dakota OCSE was able to obtain paternity determinations and child support orders from the various tribal courts. These contracts were also terminated when HHS announced that it would no longer provide matching funds.

## ANALYSIS AND DISCUSSION

### Motions to Dismiss

█ The defendants argue that this case must be dismissed because Title IV–D of the Social Security Act does not afford individuals a private right of action and thus plaintiffs do not have standing to bring this action.

Plaintiffs have sued under 42 U.S.C. § 1983. Section 1983 authorizes suits against those acting under color of state law for violations of federal law and for violations of the U.S. Constitution. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The Supreme Court has ruled that there are two situations where a § 1983 action based upon violation of a federal statute may not be brought. First, an action may not be brought under § 1983 for violation of a federal statute if that statute does not create enforceable rights in the plaintiff. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981). Second, a plaintiff may not bring suit under § 1983 for violation of a federal statute if Congress has foreclosed private enforcement in the enactment of the statute. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981).

Four recent cases have addressed the issue of whether a plaintiff has standing to bring a § 1983 action for violation of Title IV–D of the Social Security Act. In *Weh-*

*unt v. Ledbetter*, 875 F.2d 1558 (11th Cir. 1989), *cert. denied sub nom., Brown v. Ledbetter*, —— U.S. ——, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990), the Eleventh Circuit Court of Appeals, with Judge Clark dissenting, dismissed a complaint against the Commissioner of the Georgia Department of Human Resources after determining that Title IV–D did not afford the plaintiff an enforceable right. Since that decision, three courts have held that § 1983 does create enforceable rights. *See Carelli v. Howser*, 923 F.2d 1208, 1211 (6th Cir. 1991),[4] *reh'g denied en banc*, 1991 WL 3470, 1991 U.S.App. LEXIS 7102 (6th Cir. 1991); *Behunin v. Jefferson County Dept. of Social Services*, 744 F.Supp. 255 (D.Colo. 1990); *Beasley v. Ginsberg*, Civ. No. H–86–619, 1989 WL 202144, U.S. Dist. LEXIS 16682 (1989).

In determining whether plaintiff has standing to bring this action under § 1983, it must first be determined whether Congress has created enforceable rights in Title IV–D. If Title IV–D was intended to benefit the putative plaintiffs, an enforceable right exists unless it merely reflects a Congressional preference for a certain kind of conduct, rather than a binding obligation on the governmental unit, or unless the interest sought to be enforced is so vague and amorphous as to be beyond the competence of the judiciary to enforce. *Wilder v. Virginia Hosp. Ass'n*, —— U.S. ——, ——, 110 S.Ct. 2510, 2516–18, 110 L.Ed.2d 455 (1990). Upon examining Title IV–D and the legislative history that accompanied its enactment, this court finds that Congress intended Title IV–D to benefit persons such as the plaintiffs, and that the intent is expressed within Title IV–D as a binding obligation on the government and not merely as a Congressional preference.

There are several factors present that lead to the belief that Congress, in enacting Title IV–D, intended to benefit women and

---

**4.** In *Carelli*, the 6th Circuit rejected the holding in *Wehunt*, concluding that the plaintiffs in that case, all those currently eligible for child support enforcement in Clermont and Brown Counties of Ohio, were afforded an enforceable right in Title IV–D. The Court went on to hold that under the circumstances of that case, where the

Federal Secretary had already taken corrective action against the state, private enforcement was foreclosed. Under the facts of this case, the federal defendant has not taken corrective action but rather has taken the position that plaintiffs are not entitled to the benefits they seek.

children in AFDC families such as the plaintiffs. The first and most obvious is the purpose of Title IV–D set out at 42 U.S.C. § 651:

> For the purpose of enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity, obtaining child and spousal support, and *assuring that assistance in obtaining support will be available* under this part [42 U.S.C. §§ 651 et seq.] to *all children* (whether or not eligible for aid under part A [42 U.S.C. §§ 651 et seq.] for whom such assistance is requested....

42 U.S.C. § 651 (emphasis supplied). This statutory purpose demonstrates that Congress had a specific and primary intent to aid families in child support enforcement when enacting Title IV–D.

Two additional factors which reveal that Congress' primary intent in enacting Title IV–D was to aid the families of absent parents are found in the fact that Congress has expressly required states to provide Title IV–D services to non-AFDC families as well as to those receiving the benefits and that Congress has required that the first $50 collected from absent parents of AFDC recipients go to the family without a corresponding offset to the AFDC payments. These requirements would be inconsistent with the claim that the primary purpose of Title IV–D was to recoup welfare expenditures.

The most important factor indicating that Congress intended to aid families of absent parents and to give these families an enforceable right is the language of Title IV–D. Precatory rather than mandatory language was determined in *Pennhurst* to be an important factor in determining that a statute created no privately enforceable rights. 451 U.S. at 19–20, 101 S.Ct. at 1540–41. The language in Title IV–D is mandatory and set out in specific and definite terms that directly benefit the children and families entitled to support enforcement services. It sets forth what states must do to participate in the program. For example, participating states must establish the paternity of children born out of wedlock, 42 U.S.C. § 654(4)(A); they must secure payments for abandoned children and their remaining parent, 42 U.S.C. § 654(4)(B); and they must provide notice of the amount collected to each family at least annually. 42 U.S.C. § 654(5)(A); *see also Carelli,* 923 F.2d at 1210; *Carelli v. Howser,* 733 F.Supp. 271, 276 (S.D.Ohio 1990), *rev'd,* 923 F.2d 1208 (6th Cir.1991) (examples of the mandatory language found within Title IV–D). The strong mandatory language combined with the factors previously discussed leads this Court to find that Title IV–D of the Social Security Act does create an enforceable right in plaintiffs.

Plaintiffs may also be denied standing if it is shown that Congress has foreclosed private enforcement in the enactment of Title IV–D. *See Middlesex County,* 453 U.S. at 20, 101 S.Ct. at 2626. The state defendants have the burden to demonstrate "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Wright v. Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). A court should not lightly conclude that Congress intended to preclude the § 1983 as remedy for the deprivation of a federally secured right. *Id.* at 423–24, 107 S.Ct. at 770–71. The state defendants have set forth no specific provision or other evidence that would indicate to the court that Congress has precluded private enforcement of Title IV–D. The Court therefore finds that plaintiffs do have standing under § 1983 to bring this action to enforce their claims for Title IV–D child support enforcement services.

■ Defendants also argue that this case must be dismissed for failing to join indispensable parties as required by Rule 19 of the Federal Rules of Civil Procedure. Defendants claim that the nine South Dakota Indian tribes are indispensable because they have major interests and must consent to "encroachment by the state of South Dakota within reservation bound-

aries and by use of their independent tribal court systems." *See* State Defendants' Post–Trial Brief at p. 3. As is made evident by this Court's holding, consent of the tribes is not essential to provide plaintiffs relief. The Court will therefore decline to dismiss this case for failure to join the nine South Dakota Indian tribes.

*Interpretation of Title IV–D*

■ HHS has interpreted Title IV–D to preclude federal financial assistance to states to pursue absent Indian parents who reside and work on an Indian Reservation when the tribe does not comply with Title IV–D regulations. Following well-established principles of administrative law, this Court must give substantial deference to an agency's interpretation of a statute that it administers, and cannot substitute its judgment for a reasonable interpretation by the agency. *Rust v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 1759, 1766–68, 114 L.Ed.2d 233 (1991); *Connecticut Dept. of Maintenance v. Heckler,* 471 U.S. 524, 532, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577 (1985). Where the agency's interpretation of a statute "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984), *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

Although Courts must give substantial deference to an agency's interpretation, they are not required to "rubber stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the Congressional policy underlying a statute." *Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Brown,* 380 U.S. 278, 291–292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). The Administrative Procedures Act provides that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C.S. § 706(2)(A) (1985). While the scope of review under this standard is narrow, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Environmental Defense Fund v. E.P.A.,* 852 F.2d 1316, 1326 (D.C.Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). "Moreover, if the agency 'does not reasonably accommodate the policies of a statute or reaches a decision that is "not one that Congress would have sanctioned," ... a reviewing court must intervene to enforce the policy decisions made by Congress.'" *Environmental Defense Fund,* 852 F.2d at 1326 (quoting *Natural Resources Defense Council v. Herrington,* 768 F.2d 1355, 1383 (D.C.Cir.1985)). Upon review of the language of Title IV–D and the underlying purpose of the statute, this Court is unable to find that HHS's interpretation is a reasonable one.

The language and structure of Title IV–D are the foremost indicators that Congress intended all children to benefit from the child support enforcement services established by the statute. 42 U.S.C.S. § 651 specifically provides that the purpose of the Title IV–D is to enforce "the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available ... to *all* children for whom such assistance is requested." 42 U.S.C.S. § 651 (1985) (emphasis supplied). Further, § 654 provides that "A state plan for child and spousal support *must*— ... (6) provide that (A) the child support collection or paternity determination services established under the plan shall be made

available to *any individual* not otherwise eligible for such services...." 42 U.S.C.S. § 654(6) (1991) (emphasis supplied).

This language strongly indicates that Congress did not give HHS the authority to arbitrarily deny services to a large group of Indian children simply because jurisdiction over their absent parents rests with the tribal government rather than the state government. While the defendants argue that jurisdictional problems[5] have severely hindered any attempts to pursue Indian absent parents, it is clear that defendants' attempts have been limited to the use of state court enforcement procedures. While Congress may have intended and envisioned that the states would enter into cooperative agreements with tribes to solve jurisdictional problems, no agreements have resulted. It is unreasonable to assume that since the tribes have refused to submit to state jurisdiction, Indian children who in many cases have no relationship with the tribe should therefore be entitled to a lesser degree of assistance in obtaining paternity determinations and child support orders.

This is also not a case where plaintiffs are asking the defendants to undertake unreasonable measures to assist them. Defendants could provide enforcement services by reaching agreement with the respective tribal governments or they could utilize the tribal court system. The state currently has contractual agreements with state's attorneys who provide legal services to individuals seeking child support in state court. The Court cannot see any significant distinction in providing those same services to individuals pursuing Indian absent parents in tribal courts.[6] While the forum may be different, attorneys familiar with the tribal courts could contract to provide the services in the same manner currently practiced in state court.

■ The defendants, citing § 655(a)(1), contend that appropriations are authorized only for the operation of plans approved under § 654 of the plan. Because federal regulations promulgated by the Secretary require all cooperative agreements to comply with Title IV–D, *see* 45 C.F.R. § 303.-107(c), the defendants assert that they are unable to provide services on the reservations unless the tribes comply with Title IV–D regulations. The Court finds this argument unpersuasive for three reasons. First, an agency's interpretation of a statute is entitled to great deference unless that interpretation is unreasonable or inconsistent with the policies and purposes of the statute. *Bureau of Tobacco, Alcohol and Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). As discussed above, the Court finds that any interpretation of Title IV–D that has as its result the exclusion of a large percentage of Indian children and their parents from the benefits of the statute is unreasonable and contrary to the language and purposes of the statute.

Secondly, this is not a situation where plaintiffs are able to conform their conduct to comply with Title IV–D. While the situation would be resolved if the tribes would adopt the Title IV–D regulations, plaintiffs do not control what laws are adopted by the tribe. In many cases, the individuals seeking assistance may not be members of the tribe or even live on the reservation and, thus, have very little influence over

---

**5.** There is no dispute among the parties that the state does not have jurisdiction to enforce state court orders against Indians living and working on the reservation. *See Rosebud Sioux Tribe v. South Dakota*, 900 F.2d 1164 (8th Cir.1990), *reh'g denied en banc*, 1990 U.S. App. LEXIS 9521 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991).

**6.** Defendants attempted to show that tribal courts were incompetent or somehow inferior to state courts in that they were uncooperative with OCSE, showed favoritism toward certain tribal members and that they were manipulated by the tribal council. In light of recent decisions recognizing the sovereignty of tribal governments, it is important that tribal courts be recognized as legitimate tribunals for the resolution of disputes that come within tribal jurisdiction. As the U.S. Supreme Court stated in *Santa Clara Pueblo v. Martinez:* "Tribal Courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." 436 U.S. 49, 65, 98 S.Ct. 1670, 1680–81, 56 L.Ed.2d 106 (1978).

tribal policies. It is thus unreasonable to deprive them of Title IV–D services in an effort to encourage the tribes to adopt Federal regulations.

Finally, the Court is not convinced that the use of tribal courts to pursue absent parents would be contrary to the agency's own regulations.[7] The regulations provide that services not performed in compliance with Title IV–D requirements are not eligible for Federal funding. *See* 45 C.F.R. § 304.22; Federal Defendant's Post–Trial Brief at p. 8. Were the state to utilize the tribal courts in assisting plaintiffs, the services provided would be the legal counsel and tribal court fees, not the use of the tribal court. These regulations provide that these services, and not the tribal court itself, comply with Title VI–D.[8]

The state defendants have continually argued throughout this action that they have attempted to provide child support enforcement services through the state court and have been thwarted in these attempts by the tribes' unwillingness to allow enforcement of state court orders on the reservations. Defendants claim that based upon the decisions in *Rosebud Sioux Tribe*, 900 F.2d at 1172, and *State v. Spotted Horse*, 462 N.W.2d 463 (S.D.1990), this Court cannot grant the relief requested by plaintiffs. These decisions, however, recognize tribal jurisdiction over Indians living on the reservation and do not stand for the proposition that the state may not bring claims in tribal court or may not enter cooperative agreements with the tribes. As long as the state respects the tribe's jurisdiction and provides Title IV–D services through cooperative agreements with the tribes or through utilization of the tribal courts, it will not have unlawfully infringed upon tribal jurisdiction.

The state defendants also presented several hypothetical situations in which they claim it would be unreasonable for them to pursue absent parents through the tribal courts. Defendants suggest that the tribes could prohibit the state from using the tribal court when disputes arise or that situations exist where the tribal court would not have jurisdiction over an Indian absent parent living on the reservation.[9] The Court is not suggesting through this opinion that the state must pursue Indian absent parents living on the reservation through the tribal courts when the tribe has not provided a reasonable access to the court. The Court does, however, find that where no cooperative agreement has been made with a tribe for the pursuit of absent parents within the tribes jurisdiction, and where reasonable access to a tribal court exists, the children of Indian absent parents are entitled to the same degree of child support enforcement service as other children pursuing claims in state court.[10]

CONCLUSION

Congress enacted Title IV–D for the purpose of "assuring that assistance in obtaining support will be available to all children...." 42 U.S.C.S. § 651 (1985). While this does not require defendants to take unreasonable steps to provide child

---

7. There was testimony at trial that the tribal courts are open forums which would allow the commencement of paternity and child support actions without any existing cooperative agreement.

8. To the extent that the agency's regulations and policies do deter the state from providing Title IV–D services to the plaintiffs, they are unreasonable and contrary to the language and purpose of the statute.

9. The state defendants argue that ordering them to pursue Indian absent parents who live on the reservation could create a "haven" for these individuals on the Rosebud Reservation because the Rosebud Sioux Tribe does not claim jurisdiction over Indians who are not members of the tribe. This argument is flawed in that it assumes that there are individuals living on the Rosebud Reservation who are not subject to any jurisdiction. Even in the event that this assumption could be true, this Court's order would only reduce the size of the "havens" which currently exist on all reservations within the state because of defendants' refusal to provide Title IV–D services to plaintiffs.

10. The Court notes that even though the high unemployment rates on the reservation may make it difficult to collect support on the reservation, an important service is provided to children through the establishment of their paternity. *This is particularly true in the case of Indian children where the establishment of an Indian parent may entitle them to membership in the tribe, and to certain federal benefits.*

support services to anyone, the Court finds that it does require defendants to provide equal services to children and families in like situations. Simply put, this Court cannot find that, in enacting Title IV–D, Congress intended to permit defendants to exclude a large percentage of Indian children from its benefits. It is not for this Court to determine how defendants will provide the Title IV–D services to plaintiffs. Evidence presented at trial established that reasonable avenues exist for the provision of these services. Where these reasonable avenues exist, defendants must provide plaintiffs the services they are entitled to receive.

■ The Declaratory Judgment Act authorizes this Court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Declaratory relief may be granted regardless of the availability of an injunction. *Green v. Mansour,* 474 U.S. 64, 72, 106 S.Ct. 423, 427, 88 L.Ed.2d 371 (1985) (citing *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974)). Accordingly, plaintiffs are granted declaratory judgment.